STATE, Respondent, v. HERRINGTON, Appellant.

*No. State 114. Argued February 7, 1969.—Decided March 4, 1969.*
(Also reported in 165 N. W. 2d 120.)

For the appellant there was a brief and oral argument by *David E. Leichtfuss* of Milwaukee.

For the respondent the cause was argued by *Harold B. Jackson, Jr.,* assistant district attorney of Milwaukee county, with whom on the brief were *Robert W. Warren,* attorney general, and *E. Michael McCann,* district attorney.

CONNOR T. HANSEN, J.   The defendant was convicted of first-degree murder of one Julie Beckwith, ten years of age, on September 3, 1966, by stabbing her with a knife in an empty lot in the city of Milwaukee.

The second conviction of first-degree murder was the result of the death of Sherryl Thompson, eighteen years of age, on October 16, 1966, by stabbing her with a knife behind a building in the city of Milwaukee.

The conviction of attempted first-degree murder was the result of an attempt to cause the death of one Kathleen Audrey Dreyer, eleven years of age, on November 11, 1966, by stabbing her with a knife in an alley in the city of Milwaukee.

The cases were consolidated for trial and the defendant did not testify.  After examining the record, we commend both the prosecutor and the defense attorney for the manner in which the cases were tried.

On appeal, five issues were presented:

(1)  Whether defendant did not have a fair trial by an impartial jury such as to deny him due process of law?

(2)  Whether defendant's confessions were properly admitted in evidence against him at the trial?

(3)  Whether the trial court's failure to examine the state's entire file *in camera* to discover if the state had any exculpatory evidence denied defendant due process of law?

(4) Whether the failure of the state to disclose the general nature of the defendant's confession to defense counsel before trial denied the defendant due process of law?

(5) Whether defendant is entitled to a new trial in the interest of justice?

(1) Before trial, the defendant filed a motion requesting a change of venue because of community prejudice, pursuant to sec. 956.03 (3), Stats. The motion was accompanied by appellant's affidavit plus a sampling of local newspaper articles. The motion was renewed during and after the *voir dire* examination. The motion was denied each time.

The defendant asks whether a determination by this court that the trial court did not abuse its discretion in denying the change of venue on the ground of community prejudice due to pretrial publicity will, in effect, make the discretion of trial courts an absolute and the change of venue statute a nullity? We think not. The trial judge is charged with the responsibility of making such inquiry of the jurors and taking such steps as may be necessary to insure that the accused receives a fair trial free from outside influences. In the process of making such a determination, should any doubt arise in the mind of the trial judge, the exercise of sound judicial discretion requires that the motion for change of venue be granted.

In *Krueger v. State* (1920), 171 Wis. 566, 575, 177 N. W. 917, this court indicated the problems inherent in reviewing a change of venue motion:

"The difficulty of impressing upon the record a true concept of the public sentiment in the county is manifest. Just as the trial judge is in a better position to weigh the testimony of witnesses who appear before him, so is he in a better position to judge of the public sentiment of the county. He is on the ground and in a position to sense, in a way that this court cannot, the true sentiment of the community and to judge much more correctly whether it is such as to prevent a fair trial on the part of the defendants."

While the difficulty of securing a jury should never be conclusive in reviewing a refusal to change venue in a criminal case, precedent has said that it may be taken into consideration.

" 'The apparent difficulty or ease of securing a jury can be taken into account in passing upon the alleged abuse of discretion in refusing a change of venue.' " *Miller v. State* (1967), 35 Wis. 2d 777, 785, 786, 151 N. W. 2d 688, quoting from *Bianchi v. State* (1919), 169 Wis. 75, 93, 171 N. W. 639.

In *Miller,* where no abuse of discretion was found, the *voir dire* examination was completed in less than one-half day and a jury of 12 and one alternate was selected from 42 prospective jurors. *Bianchi* found no abuse of discretion partly because the jury was selected in less than a day and required the examination of only 37 prospective jurors.

In this case the record indicates 100 jurors were available for duty. Seven of the panel of 100 were excused because they indicated that they could not render a just and true jury verdict because they had read or heard too much about the case. One other panel member was later excused by the court because she stated she had formed an opinion. The 92 members left on the panel indicated they could render a just and true verdict.

The record does not indicate the length of time it took to select a jury, but only 38 members of the panel were examined in order to produce the necessary jurors. On review of an alleged abuse of the trial court's discretion in failing to grant a motion for change of venue because of community prejudice and pretrial publicity, the ease of selecting a jury is not a criterion but an indicium.

As indicated in *Miller,* the more difficult question is whether there was a probability that the defendant was denied due process of law because he failed to receive a fair trial by an impartial jury even though the trial court did not abuse its discretion in refusing to order a change of venue.

In *Sheppard v. Maxwell* (1966), 384 U. S. 333, 352, 86 Sup. Ct. 1507, 16 L. Ed. 2d 600, the United States Supreme Court determined that it would view the totality of the circumstances to determine whether or not there was a probability of prejudice.

The defendant argues that he should have been permitted to examine individual prospective jurors outside the presence of other prospective jurors on the *voir dire.*

In *State v. Nutley* (1964), 24 Wis. 2d 527, 546, 129 N. W. 2d 155, this court stated:

"A determination as to the subjective sincerity of this man [a juror] in expressing his final view of the fairness is a matter within the discretion of the trial court."

To accept defendant's argument is to assume that jurors would not admit in front of other jurors that they have prejudged the case. That defendant's premise is doubtful is demonstrated by the fact that eight jurors in fact did state that they could not render a just and true jury verdict. The court excused all eight.

*Nutley, supra,* at 546, recognized the following statement from *Irvin v. Dowd* (1961), 366 U. S. 717, 722, 723, 81 Sup. Ct. 1639, 6 L. Ed. 2d 751, 756:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

The record indicates that every juror who was not stricken for cause stated that he or she would be able to

arrive at a fair and impartial verdict based on the evidence that was given in court. Defendant's contention that this final conclusion should be subject to private interrogation in order to determine its validity is unsubstantiated.

The defendant also asserts that a fair trial was prejudiced by the trial court's refusal to allow the defense counsel to ask jurors whether they had read *particular* newspaper articles. We consider the trial court's refusal to be entirely proper. If the juror did not know about a particular article before such an examination, he would know about it after the examination.

A juror is not required to be ignorant of the existence of a case. The defense counsel was permitted to ask the individual jurors general questions as to whether mass media coverage had influenced the juror and in each instance the juror stated it had not and that he could arrive at a fair and impartial verdict. The trial court's manner of conducting the *voir dire* did not prejudice a fair trial.

On the day before trial, the state moved, pursuant to sec. 957.08, Stats., to have the jury view the scenes of the three crimes. The defense objected to the granting of the motion. Since one of the offenses was committed during the daytime hours, the scene was visited during daytime hours, and since two of the offenses were committed during nighttime hours, these scenes were visited during nighttime hours. Prior to viewing the scenes, the judge carefully and thoroughly instructed the jury as to the purpose of the views and the manner in which they were to be conducted. The jury was under the control of the sheriff and transportation was provided by bus.

At the scenes of the crimes the trial judge requested counsel for both sides to indicate anything that they would like to have the judge point out to the jury. The judge then proceeded to tour the scene of each individual crime with the jury. His statements were reduced to writing

and are a part of the record. As the trial court informed the jury, "[a] view is not taken to obtain evidence in addition to or in contradiction of the evidence that will be given here in court. Its sole purpose is to enable the jurors better to understand the evidence which is introduced in this courtroom and to assist them in weighing and applying the evidence." *Haswell v. Reuter* (1920), 171 Wis. 228, 233, 177 N. W. 8.

We see nothing improper in having the jury view the scenes of the crimes as they approximately appeared when the offenses were committed.

The defendant alleges that certain questions asked and statements made by the court indicated to the jury prejudice on the part of the trial judge. An examination of the record does not support such an assertion. We do find an occasion where the trial judge's questioning of the arresting officer after the defense finished its cross-examination is clearly repetitious and not explanatory of any confusion. However, we are unable to infer any bias or prejudice on the part of the trial judge in so doing. The instructions to the jury also include the following:

"If, during the trial of these cases, I have given or I may give in my phraseology of these instructions any impression to any member of the Jury as to my opinion as to the guilt or innocence of this defendant in any of these cases, I charge that you should entirely disregard such impression and decide the issues of fact in each case solely as you view and weigh the evidence. You, the Jury, are the sole judges of the facts and the Court is the Judge of the law only."

The court has the right to question witnesses to ensure that the jury is not confused by any testimony. However, it is elementary that the conduct of the judge trying the case must be fair to both sides. The trial judge should not by the form, manner or event of his questioning, indicate to the jury his opinion as to the defendant's guilt. *State v. Driscoll* (1953), 263 Wis. 230, 238, 56 N. W. 2d 788.

The court also took steps to insure a fair trial by sequestering the jury during the entire trial.

Viewing the totality of the circumstances, we conclude that the defendant received a fair trial before an impartial jury.

(2) Defendant claims the necessary quantum of evidence sufficient to establish probable cause to arrest without a warrant is not demonstrated by the record.

At a hearing to determine the voluntariness of the defendant's confessions, in conformance with *State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753, Officers Stroessner and Stelter of the Milwaukee police department were questioned as to the underlying factual basis for their arrest of the defendant.

On November 11, 1966, sometime prior to 8:42 a. m., one Kathleen Audrey Dreyer was accosted and stabbed by an unknown assailant in an alley in Milwaukee. This is the incident that gave rise to the attempted murder charge.

Stroessner stated that he and his partner had been alerted to look for a black 1957–1959 Chevrolet which was observed at the scene of the stabbing. The police radio described the driver of the car as a white male, approximately nineteen years old, with short, black hair, and wearing dark horn-rimmed glasses and a brown jacket with the letter "G" on the front.

Based on this information, the two officers stopped the defendant at 10:45 a. m. the day of the stabbing after he had driven past them on a street in Milwaukee. Stroessner directed his partner to follow the car and when it came to a stoplight he walked to the driver's side of the defendant's car and asked him to pull around the corner and park. The defendant turned the corner, got out of his car and stated, "I know what you want, a cop on a motorcycle stopped me a little while ago downtown." (Herrington had been stopped earlier by a patrolman, questioned and then released.)

Stroessner asked for and received some identification —the defendant's driver's license. At this point, the defendant requested to go to a service station to have a tire repaired. The officers consented and followed the defendant to the service station.

Stroessner then called Captain Sprague at the No. 5 District police station from a call box to ask his advice. Captain Sprague advised Stroessner that if in their minds this man answered the description of the man being sought, they should bring him into the police station.

When met by Stroessner and his partner, Herrington was driving a black 1957 Chevrolet, was a white male, twenty-three years old, had black hair, and was wearing dark horn-rimmed glasses. The only part of the police broadcast description that did not fit Herrington was the fact that the defendant was wearing a dark blue or black jacket with no emblem or letter on it.

Stroessner asked Herrington if he would come to No. 5 station where they could talk and Herrington said, "Sure." Stroessner did not indicate to Herrington that he was under arrest and the record is clear that Herrington's decision to go to the police station was voluntary. Herrington drove his own car to the station with Stroessner sitting beside him.

Stroessner testified that after arriving at the police station with the defendant, he read some teletypes regarding the offense, conferred with Officer Stelter, and informed the defendant he was under arrest for aggravated battery. This occurred at approximately 11 a. m. Stroessner could not recall the substance of the teletypes and the defense questions whether they ever existed.

On the basis of testimony at the hearing, the trial court found that probable cause had been shown on the part of the state to arrest the defendant. The court further found that defendant was legally arrested by Stroessner while at the District No. 5 police station.

In *State v. Carter* (1966), 33 Wis. 2d 80, 90, 91, 146 N. W. 2d 466, it was held:

"Where the court has made detailed findings of facts as was done here, our review of the evidentiary or historical physical facts will be limited to the same review that is used in other factual disputes heard and determined by a trial judge. The findings of the trial court will not be upset unless they are against the great weight and clear preponderance of the evidence."

It is clear that there was probable cause for the defendant's arrest. The court found that the arrest took place at the District No. 5 police station; however, whether the arrest occurred at the service station or at the police station, the officers had more than mere suspicion to arrest the defendant.

"Probable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime." *Kluck v. State* (1967), 37 Wis. 2d 378, 389, 155 N. W. 2d 26.

The quantum of evidence required to establish probable cause is less than that which would justify conviction. *State v. Beal* (1968), 40 Wis. 2d 607, 162 N. W. 2d 640.

It was the opinion of the two patrolmen that Herrington fit the description broadcasted over the police radio. Specifically, the broadcast described the suspect as driving a black 1957–1959 Chevrolet, a white man, approximately nineteen years of age with short, black hair and wearing dark horn-rimmed glasses.

The defendant at the time of his arrest was operating a black 1957 Chevrolet, was approximately nineteen years of age, had short, black hair, and was wearing horn-rimmed glasses.

The defendant contends that he was not given any *Miranda* warnings upon his arrest and interrogation.

At a preliminary hearing the trial judge made a full determination of the voluntariness of the confession. The court found that the defendant had been meticulously advised of his rights on three different occasions, first

by the arresting officer in the presence of his partner, a second time by Detective Dorsey Tisdale and a third time by Detective Patrick Call; and that the defendant fully understood all of his rights. The court further found that there were no threats or promises, no physical force, no psychological inferences or force exerted upon the defendant; that the statements were freely and voluntarily given by the defendant; and that they were constitutionally antiseptic and clear of any violation of the defendant's constitutional rights and were in no manner, shape or form contaminated.

The defendant asserts that the testimony of the police officers did not meet the burden of the state's proof and the result was an uneven swearing contest between several police officers and a single defendant. The record does not support such an assertion for both the written statements by the defendant and the stenographic reportings later taken support the testimony of the police officers.

The question of whether the proper warnings were given was entirely a question of fact. The findings of the trial court were not against the great weight and clear preponderance of the evidence. *State v. Carter, supra,* pages 90, 91.

The defendant contends that the delay from the time of his arrest at 11 a. m. to the time of his arraignment before a magistrate at 8:45 p. m. was unreasonable and that confessions made during that period are inadmissible. We are unable to agree with this contention. The record also indicates that during this period, the defendant was given both food and drink, made a phone call, and was not held incommunicado.

The record indicates that after the defendant was told he was under arrest, the arresting officer advised him of his constitutional rights and questioned him for five or ten minutes. Shortly thereafter, two detectives again advised him of his constitutional rights and questioned

him from shortly after 12 noon until two p. m. At approximately 3:15 p. m. the defendant was taken to the Safety Building because of the request of a sergeant and also because there were a number of news reporters and television cameras around the station, which the defendant indicated he did not like.

While at the Safety Building the defendant wrote and signed confessions admitting the stabbing-murders of Julie Beckwith on September 3, 1966, and of Sherryl Thompson on October 16, 1966, and the stabbing of Kathleen Audrey Dreyer on November 11, 1966. These confessions were signed sometime between 3:45 p. m. and 5:20 p. m. on the day of his arrest.

At 5:45 p. m. the defendant voluntarily went with the police to his place of employment to locate the knife which the defendant stated was used in the stabbings and which he had hidden under a cabinet. Thereafter he led police officers to the scenes of the three crimes. During this period a continuing stenographically recorded statement was taken. The record reflects that the defendant was advised of his constitutional rights at each of these stops, before he was asked any questions.

All the statements were taken before eight p. m. on the day of his arrest and he appeared before a magistrate at 8:45 p. m. on the same day.

The defendant contends that the delay between the time he signed the confessions in the Safety Building in the late afternoon and the time he was taken before a magistrate at 8:45 that evening was used solely for the purpose of "sewing up" the case by obtaining further confessions or culpable statements to support his arrest or prove his guilt in violation of due process of law. Our attention has been directed to *Phillips v. State* (1966), 29 Wis. 2d 521, 139 N. W. 2d 41, and *Reimers v. State* (1966), 31 Wis. 2d 457, 143 N. W. 2d 525. We are of the opinion that neither *Phillips* nor *Reimers* supports the contention of the defendant.

At about 11 a. m., the defendant was arrested for the stabbing of Kathleen Audrey Dreyer earlier that morning. During the afternoon, he implicated himself in two previous murders by his confessions. Immediately thereafter he voluntarily took the police to his place of employment to get the knife and led them to scenes of the three crimes. There is no evidence of any coercion, duress or force. We are of the opinion that the police officers acted both prudently and expeditiously before causing the defendant to be arraigned on the two murder charges. Under the facts of this case, we deem the detention to be for a proper purpose. The interrogation was expeditiously carried out and the detention was not unreasonable or coercive, *Phillips, supra,* 533.

This court pointed out in *Pulaski v. State* (1964), 23 Wis. 2d 138, 126 N. W. 2d 625, and on numerous occasions since, that long detentions are looked upon with disfavor and seriously impair the voluntariness of the confession from the standpoint of the psychological aspect of the usual police station hazards. In *Reimers, supra,* the defendant was confined early Sunday morning and was not taken before a magistrate until the following Tuesday. Prior to this time he was not informed of the charges against him nor was he afforded the opportunity to have counsel. We here reiterate our disfavor of long police detentions and the attendant problems of coerced confessions and possible sew up confessions, but a review of the record leads us to conclude that the facts of this case are not such as to encompass those rules.

(3) Pursuant to *Brady v. Maryland* (1963), 373 U. S. 83, 83 Sup. Ct. 1194, 10 L. Ed. 2d 215, the defendant requested the state to turn over all evidence exculpatory in nature and bearing on the issue of guilt or punishment.

The trial court ordered the prosecutor to turn over to the defense counsel all evidence exculpatory in nature contained in the files of the police department and the office of the district attorney. The trial was then ad-

journed until the next morning. The prosecuting attorney then informed the court that all evidence of an exculpatory nature had been made available to the defense counsel. The defendant now suggests that the trial court be required to examine the files of the police department and the prosecuting attorney *in camera* to determine if his order had been complied with.

The rule is stated in *Brady v. Maryland, supra,* at 87:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

From an examination of the record, we conclude that the trial court was fully cognizant of the holding in *Brady v. Maryland* and exercised considerable diligence in its proper application.

(4) In *State v. Miller* (1967), 35 Wis. 2d 454, 465, 151 N. W. 2d 157, this court held that to make the hearings on preliminary determination of voluntariness informed and meaningful, at least the general substance of the confession or statement should be made known both for the benefit of the court and the defense counsel. The defendant takes the position that because he did not receive copies of his in-custody statements he was denied due process.

We are of the opinion the defendant's contention is without merit for the reason that *Miller* also held that the statements of the district attorney and testimony of the police officers constituted sufficient disclosure. In this case, the defense counsel listened to the testimony of the state's witnesses at the hearing and from this found out that the defendant confessed to all three crimes in writing and also gave inculpatory statements at the scene of each offense.

Furthermore, the defendant himself was available to defense counsel.

"The purpose of the hearing is to determine voluntariness and it is not to be converted to an adverse pretrial discovery hearing." *Miller, supra*, at 465.

(5) In *State v. Fricke* (1934), 215 Wis. 661, 667, 255 N. W. 724, this court stated:

"Occasionally when such grave doubts exist in our minds regarding the guilt of a defendant as to make us conscientiously believe that justice probably has miscarried, we exercise the authority specifically given to us by sec. 251.09, Stats., and reverse the judgment for a new trial."

There can be no such grave doubts about this case. The defendant confessed fully and in detail to each offense, and the corroborating evidence is overwhelming.

*By the Court.*—Judgments affirmed.