LEROUX, Plaintiff in error, v. STATE, Defendant in error.

*No. State 42. Argued May 1, 1973.—Decided June 5, 1973.*
(Also reported in 207 N. W. 2d 589.)

672

For the plaintiff in error there was a brief and oral argument by *John E. Shannon, Jr.,* of Stevens Point.

For the defendant in error the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

CONNOR T. HANSEN, J. Because of the gravity of the offenses charged and the nature of the issues raised on appeal, we consider it desirable to set forth certain facts in detail.

The defendant was convicted of having murdered his parents, Eugene Leroux and Mary Leroux, on November 8, 1967. At approximately 3:50 a. m. of that day Sheriff Check received a call that the Leroux residence in the town of Lanark in Portage county was burning and it was thought that Eugene and Mary Leroux had died in the fire. He called the coroner, Joseph Bodzislaw, and they proceeded to the Leroux residence. Arriving there, they discovered that the house had burned down and had fallen into the basement, and they were informed that the Leroux children, Mark, aged eighteen, and Jeannette, aged fifteen, were at the home of Frank and Beverly Budzbanowski, friends of the family who lived two miles away. The sheriff learned that the children, upon discovering the fire, had gone to the Budzbanowski residence for aid and to spread the alarm. After viewing the fire briefly, the sheriff and the coroner proceeded to the Budzbanowski home and on the way noticed that the

children had passed nine other farm homes on their way to reach the Budzbanowski residence. One of these homes was almost in sight of the Leroux home.

Sheriff Check was acquainted with the defendant. In March, 1965, when the defendant was sixteen years old, he was apprehended by the Waupaca county sheriff and returned to the custody of Sheriff Check. The defendant was accused of reckless use of weapons. Investigation indicated that the defendant had pointed a .45-caliber pistol at one Frank Grulke to force him to drive the defendant and a companion from Amherst, Wisconsin, to Chicago, Illinois. When they stopped for gas at Sheridan in Waupaca county, the defendant gave the pistol to his companion and went into the station. Grulke scuffled with the other boy and succeeded in grabbing the boy and holding onto the weapon. The defendant, having returned, picked up a shovel and threatened to strike Grulke. The gas station attendant subdued the defendant and the boys were turned over to the Waupaca county sheriff, who reported the incident to Sheriff Check. Upon questioning the boys, the authorities were informed that the boys had committed twenty-one burglaries of homes, cottages and a store, in the area, from September of 1964 to March of 1965.

In the course of his investigation of the burglaries, Sheriff Check went to the Leroux home to recover some of the stolen property. In the company of Mrs. Leroux, he went to the garage and recovered some of the stolen property that was in sight over the door. At the hearing on defendant's motion for a new trial, the sheriff testified that Mrs. Leroux said, "Look what he does, he puts it in a place I can find it, just so he can hurt me. He always does it. He will do something just to hurt me."

Sheriff Check testified that, following defendant's juvenile apprehension, he recovered from the defendant a statement entitled, "The Epitaph of an Unwanted," written and signed by the defendant.

After the 1965 juvenile incident, the sheriff talked with the county supervising nurse, Mrs. Ruth Gilfrey. Mrs. Gilfrey worked in the Marshfield Clinic dealing with psychiatric problems. The sheriff showed Mrs. Gilfrey the statement written by the defendant. Mrs. Gilfrey told the sheriff at that time that the defendant had had a lot of trouble with his mother. She stated that the person who wrote "The Epitaph of an Unwanted" was angry and needed help, and that he could be very quiet and peaceful at times, and at other times he could be angry and would want to destroy. The sheriff testified that, at the time of the fire and subsequent investigation, he considered the defendant to be dangerous and capable of hurting his mother.

When the sheriff and the coroner arrived at the Budzbanowski home, the sheriff asked to speak to the children, separately. He took the defendant to his car, and, in the presence of the coroner, advised him of his constitutional rights and questioned him about the fire. The defendant said he and his parents and his sister had been home until about 6:30 p. m., when his parents went to Amherst to a venison feed. He and Jeannette stayed home. The parents returned later, and all watched television until about 10 p. m. The defendant stated that first his father went upstairs and then his mother. Jeannette was sleeping in a downstairs bedroom, and the defendant went to sleep on a couch in the living room. He said he was awakened by Jeannette who screamed the house was on fire. He said the house was full of smoke and the parents were trapped upstairs. He tried to get upstairs but could not because of the smoke, so he yelled to his parents a few times. By this time Jeannette was hysterical, so he told her to grab some important papers and leave the house. They then drove to the Budzbanowski home and turned in the alarm.

The sheriff excused the defendant and got Jeannette into the car. He advised her of her constitutional rights and asked her what happened. Her story was identical in

all respects to that told by the defendant, except she said her dog had awakened her.

After the interviews, both the sheriff and the coroner commented upon the fact that the children were very neat and their clothes did not smell of smoke. They both seemed very composed for having just lost their parents and home, and there was no evidence of hysteria about Jeannette. The sheriff said that it was strange that the children drove past so many houses where they could have turned in the alarm and that he thought the stories were remarkably similar and seemed "pat." The sheriff further indicated at that time that he felt it was strange that the children had had the time to save some guns and papers, but not their parents.

Upon returning to the fire, the sheriff directed operations to recover whatever bodies may be in the debris. Two charred bodies were recovered from the basement. No autopsy was performed at that time because of the difficulty the sheriff had experienced at the local level in getting them performed. The sheriff was informed that the fire had apparently started in the upstairs bedroom.

Later in the day, the sheriff and coroner discussed further questioning of the Leroux children, but because the Budzbanowskis had seemed so upset when they questioned them the first time, they decided to wait until after the funeral. The sheriff did call the state crime laboratory and arranged for the administration of lie detector tests to the children.

Eugene and Mary Leroux were buried on Saturday, November 11, 1967. Visiting at the Budzbanowski home for the funeral were Matthew Reinert, his wife, Geraldine, and their daughter Kathy. The Lerouxs and the Reinerts had been close friends. Jeannette considered Kathy her best friend.

The Sunday following the funeral, Jeannette and Kathy spent some time together talking. Jeannette said she had something to tell but wanted Kathy to keep it a secret,

but if something happened to Jeannette, then Kathy should tell. Jeannette then told Kathy what happened on the evening of November 7, 1967. She said that she and the defendant were home alone watching television when the defendant suggested they should get rid of their folks by poisoning or shooting them. Jeannette told the defendant to shut up, but he persisted. After the parents had gone upstairs to bed, Jeannette went to sleep in the downstairs bedroom. She was awakened when she heard shots. Jeannette stayed in bed until the defendant came into her bedroom and told her he had shot their parents and that she should get packed. She said that at that time she was afraid of him. The defendant then went upstairs and started the fire in the parents' bedroom with the kerosene from some lamps. They then went to the Budzbanowski home. Jeannette also told Kathy that, before and after the funeral, Mark had mentioned to Jeannette that they had gotten away with a perfect crime.

Kathy told no one the story related to her by Jeannette until after the Reinert family had returned home to Carpentersville, Illinois. After Kathy told her parents the story, Mr. Reinert told Mrs. Reinert to take Kathy and go back to Wisconsin. That night Mrs. Reinert called Mrs. Budzbanowski and told her she was coming to see her the next day.

On Tuesday, November 14th, the day of defendant's arrest, Mrs. Reinert and Kathy returned to Wisconsin. Mrs. Reinert left Kathy at Jeannette's school to visit and then went to the Budzbanowski home. Mrs. Reinert related at length to Mrs. Budzbanowski the story Kathy had told her. The two women then told Mr. Budzbanowski the story. He left to see Roman Jungers, the funeral director who had been in charge of the burials.

Since the time of the fire, Jeannette had been living with the Budzbanowskis and the defendant had been living in his apartment in Stevens Point. The Budzbanow-

skis had invited him for supper on Tuesday night, sometime between 5:30 and 6 p. m.

Before leaving to see Mr. Jungers, Mr. Budzbanowski told the women to talk to Jeannette as soon as she got home to assure themselves of what she was saying. He also said that she and Kathy should not be around when the defendant came for supper because he might get suspicious. They decided to send Kathy and Jeannette by school bus to a basketball game in Almond, Wisconsin.

After consulting with Mr. Jungers, Mr. Budzbanowski returned home to talk with his wife and Mrs. Reinert. By the time he arrived, Jeannette and Kathy had left for the basketball game. The women had talked to Jeannette, and she had repeated the same story. In addition, they learned that the pistol the defendant had used was one that had been in Mary Leroux's dresser drawer.

Mr. Budzbanowski decided to go back to see Mr. Jungers at his place of business in Amherst. He and his wife were now concerned about the safety of their family if the defendant were to return and find Mrs. Reinert present.

When Mr. Budzbanowski returned to Mr. Jungers' place of business, they called attorney Richard Olk, who was the attorney for the Budzbanowskis and who was handling the affairs of Mr. and Mrs. Leroux. Mr. Olk, after arriving at Mr. Jungers' place of business and discussing Jeannette's story, decided to call Sheriff Check.

Mr. Olk told the details of the story as it had been related to him to Sheriff Check. They discussed the possible type of murder weapon and the manner in which the fire had been started. The sheriff was informed how Mr. Olk had come by this information and that Jeannette and Kathy were at a basketball game in Almond. Mr. Olk impressed upon the sheriff the urgency of the situation and the possible danger to the Budzbanowski family. He stated that they did not know whether the defendant was at his apartment, or on his way to the Budzbanowski home. By this time it was about 5:30 p. m.

The sheriff testified that upon receiving this information, he radioed his headquarters to get some additional officers to assist him and requested them to see if they could obtain the services of the district attorney and county judge. They were not in their offices. Sheriff Check then told them he was proceeding to the defendant's apartment and requested the other officers to meet him there.

Upon arriving at the defendant's apartment, the officers arrested the defendant, informed him of his constitutional rights, and then asked him if he had any weapons. The defendant pointed to two davenport cushions and said they were there. The sheriff recovered from beneath the cushions two automatic pistols, one of which was a .25-caliber pistol, later identified as having belonged to Mary Leroux. At defendant's trial, this weapon was identified as the murber weapon and introduced into evidence by the state.

The issues presented by the defendant on appeal to this court for review are:

1. Was the pistol improperly admitted in evidence because it was obtained incident to an alleged unlawful arrest?

2. If the arrest was valid, was the seizure of the weapon incidental thereto reasonable?

3. Were defendant's constitutional rights violated in that the defendant was not personally present during pretrial conference in chambers between his counsel, the prosecutor and the trial judge?

4. Does the record otherwise demonstrate prejudicial error committed at trial?

5. Was the representation of the defendant by his court-appointed attorney so inadequate and incompetent as to deny the defendant a fair trial? [1]

---

[1] Incompetency of counsel raised pro se by the defendant in brief filed with leave of this court.

*Legality of the arrest.*

In the instant case, we are of the opinion that the prior knowledge of Sheriff Check of the propensities of the defendant and the information available to the sheriff prior to the telephone call from Attorney Olk, are of particular importance. While Jeannette's oral statements, as related to the sheriff by Attorney Olk, were in direct conflict with her statement given on the night of the incident, the fact is that the sheriff had not believed her earlier statements and had found them to be incredible. Jeannette's information, as related to the sheriff by Olk, that the defendant had started the fire in the upstairs bedroom to conceal his crime, supported his own investigation which revealed that the fire had started in the upstairs bedroom. The sheriff was also aware of the defendant's activities as a juvenile and considered him dangerous and capable of hurting his mother. The accused's reputation, if known by the police officer, may be considered in determining whether probable cause exists for a warrantless arrest.[2]

Under the facts of this case, the circumstances which resulted in Jeannette's statements being indirectly communicated to the sheriff does not reduce them to casual rumors or deprive them of their reliability. The record also reveals that a probable risk of harm to others existed if the sheriff had taken the time to go to Almond and get Jeannette out of the basketball game or obtain a warrant. Such a factor may also be considered in determining whether or not probable cause for a warrantless arrest exists. *State v. Camara* (1965), 28 Wis. 2d 365, 375, 137 N. W. 2d 1.

An arrest without a warrant will support an incidental search if there is probable cause to make the arrest.

---

[2] *United States v. Harris* (1971), 403 U. S. 573, 583, 91 Sup. Ct. 2075, 29 L. Ed. 2d 723.

*State v. Doyle* (1968), 40 Wis. 2d 461, 162 N. W. 2d 60; *State v. Camara, supra; Ker v. California* (1963), 374 U. S. 23, 83 Sup. Ct. 1623, 10 L. Ed. 2d 726; *Henry v. United States* (1959), 361 U. S. 98, 80 Sup. Ct. 168, 4 L. Ed. 2d 134; *Carroll v. United States* (1925), 267 U. S. 132, 45 Sup. Ct. 280, 69 L. Ed. 543. "Probable cause" as required by the fourth amendment of the United States Constitution is substantially the same as that required by art. I, sec. 11 of the Wisconsin Constitution. In *State v. Paszek* (1971), 50 Wis. 2d 619, 624, 184 N. W. 2d 836, this court stated:

". . . 'Probable cause' to arrest is a requirement of the fourth amendment of the United States Constitution, binding upon the individual states through the fourteenth amendment. *Giordenello v. United States* (1958), 357 U. S. 480, 485, 78 Sup. Ct. 1245, 2 L. Ed. 2d 1503. This court has recognized that art. I, sec. 11 of the Wisconsin Constitution is substantially like the fourth amendment of the United States Constitution, and that the standards and principles surrounding the fourth amendment are generally applicable to the construction of art. I, sec. 11. Therefore a finding of probable cause under federal standards will normally result in a finding of probable cause under state standards. *Browne v. State* (1964), 24 Wis. 2d 491, 503, 129 N. W. 2d 175, 131 N. W. 2d 169. Conversely, under *Giordenello v. United States, supra,* a lack of probable cause under federal standards precludes a constitutionally valid finding of probable cause under state standards." [3]

When an arrest is made without a warrant, the burden is on the state to show the existence of probable cause.[4]

Probable cause for an arrest without a warrant requires more than an officer's subjective good-faith be-

[3] *See also: Browne v. State* (1964), 24 Wis. 2d 491, 129 N. W. 2d 175, 131 N. W. 2d 169, certiorari denied (1965), 379 U. S. 1004, 85 Sup. Ct. 730, 13 L. Ed. 2d 706; *Ker v. California, supra.*

[4] *Vale v. Louisiana* (1970), 399 U. S. 30, 90 Sup. Ct. 1969, 26 L. Ed. 2d 409.

lief [5] or mere suspicion.[6] However, probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support conviction,[7] and the quantum of evidence required to establish probable cause is less than that which would justify conviction.[8] The court, in *Draper v. United States* (1959), 358 U. S. 307, 313, 79 Sup. Ct. 329, 3 L. Ed. 2d 327, defined "probable cause" as:

" 'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v. United States, supra,* at 175 [(1949), 338 U. S. 160, 69 Sup. Ct. 1302, 93 L. Ed. 1879]. Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v. United States,* 267 U. S. 132, 162."

Similarly, this court in *Kluck v. State* (1967), 37 Wis. 2d 378, 389, 155 N. W. 2d 26, stated:

"Probable cause exists if the facts and circumstances known to the police officer warrant a prudent man in believing an offense has been committed. . . . [citing

---

[5] *Hill v. California* (1971), 401 U. S. 797, 91 Sup. Ct. 1106, 28 L. Ed. 2d 484.

[6] *State v. DiMaggio* (1971), 49 Wis. 2d 565, 182 N. W. 2d 466; *State v. Camara, supra; Terry v. Ohio* (1968), 392 U. S. 1, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889; *Wong Sun v. United States* (1963), 371 U. S. 471, 83 Sup. Ct. 407, 9 L. Ed. 2d 441; *Mallory v. United States* (1957), 354 U. S. 449, 77 Sup. Ct. 1356, 1 L. Ed. 2d 1479.

[7] *Adams v. Williams* (1972), 407 U. S. 143, 92 Sup. Ct. 1921, 32 L. Ed. 2d 612.

[8] *State v. Herrington* (1969), 41 Wis. 2d 757, 165 N. W. 2d 120; *State v. Beal* (1968), 40 Wis. 2d 607, 162 N. W. 2d 640; *State v. Camara, supra; United States v. Ventresca* (1965), 380 U. S. 102, 85 Sup. Ct. 741, 13 L. Ed. 2d 684.

*Henry v. United States* (1959), 361 U. S. 98, 80 Sup. Ct. 168, 4 L. Ed. 2d 134]. Probable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime." [9]

A review of the entire record demonstrates that Sheriff Check had probable cause to arrest the defendant. While Attorney Olk's telephone conversation with the sheriff provided the final impetus for the arrest and his narrative of Jeannette's story was undoubtedly hearsay, nevertheless, hearsay evidence may be used to support, in part, probable cause. *State v. Mansfield* (1972), 55 Wis. 2d 274, 198 N. W. 2d 634; *State v. DiMaggio, supra; Browne v. State, supra; Draper v. United States, supra; Brinegar v. United States, supra.*

In *Aguilar v. Texas* (1964), 378 U. S. 108, 84 Sup. Ct. 1509, 12 L. Ed. 2d 723, and *Spinelli v. United States* (1969), 393 U. S. 410, 89 Sup. Ct. 584, 21 L. Ed. 2d 637, the Supreme Court of the United States discussed the quantum of evidence which the officer must possess and present to the magistrate in order to establish sufficient probable cause to authorize the issuance of a warrant based on hearsay information. In *Aguilar v. Texas, supra,* the court established two requirements:

1. The application must set forth sufficient "underlying circumstances" necessary to enable the magistrate to independently judge the validity of the informant's information.

2. The police officers must support their claim that the informant was reliable and credible. [10]

In *State v. Paszek, supra,* pages 627, 628, this court, referring to *Spinelli v. United States,* stated:

---

[9] *See also: State v. Paszek, supra,* page 625; *State v. DiMaggio, supra,* page 573; *State v. Herrington, supra,* page 770; *State v. Camara, supra,* page 373; *State v. Doyle, supra,* page 466.

[10] The same test is applicable in the instant case in examining the officer's probable cause to arrest without a warrant. *Wong Sun v. United States, supra; State v. Paszek, supra.*

" 'The informer's report must first be measured against *Aguilar's* standards so that its probative value can be assessed. If the tip is found inadequate under *Aguilar*, the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration? *Aguilar* is relevant at this stage of the inquiry as well because the tests it establishes were designed to implement the long-standing principle that probable cause must be determined by a "neutral and detached magistrate," and not by "the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U. S. 10, 14 (1948). A magistrate cannot be said to have properly discharged his constitutional duty if he relies on an informer's tip which—even when partially corroborated—is not as reliable as one which passes *Aguilar's* requirements when standing alone.' "

In the instant case the "underlying circumstances" are supported by the fact that the statements of Jeannette are an account of the facts based upon her own observations. The fact that the hearsay information is an actual eyewitnesses' description of the crime has been given great importance by this court and the United States Supreme Court.[11] Actual observation of the criminal act by Jeannette is sufficient "underlying circumstances" to meet the first requirement in *Aguilar v. Texas, supra.*[12]

In *State v. Paszek, supra,* this court determined that the reliability of a "citizen informer," as opposed to the traditional unnamed police contacts or informers, who are usually themselves criminals, should be evaluated

[11] *State v. Mansfield, supra; State v. Knudson* (1971), 51 Wis. 2d 270, 187 N. W. 2d 321; *United States v. Harris, supra.*

[12] *State v. Mansfield, supra,* page 279.

"from the nature of his report, his opportunity to hear and see the matters reported, and the extent to which it can be verified by independent police investigation." In applying this test to the instant case, the reliability of Jeannette has been sufficiently shown to support Sheriff Check's belief that a crime had been committed and that the defendant probably committed it.

The information given to Sheriff Check was the result of Jeannette's own observations. Observation is an element of reliability as well as an underlying circumstance.[13] Observation of the criminal act plus reliance on the informant by the police is sufficient to support a finding of probable cause. *United States v. Harris, supra.*

The record in this case demonstrates a totality of circumstances evidencing probable cause for the arrest without a warrant.

### Scope of the search.

Since we have concluded there was probable cause for the arrest of the defendant without a warrant, it follows that the sheriff could, as an incident to the arrest, conduct a reasonable search.[14]

Sheriff Check and the other officers summoned by him went to the defendant's apartment in Stevens Point to arrest the defendant for the murder of his parents. Upon arriving at the scene they noticed that the lights were on in defendant's upstairs apartment. Sheriff Check sent one officer to cover the rear exit and then proceeded with the other officers to defendant's apartment to effect the arrest. The sheriff knocked on the door of the apartment and the defendant's roommate answered the

[13] *State v. Mansfield, supra; State v. Knudson, supra; State ex rel. Cullen v. Ceci* (1970), 45 Wis. 2d 432, 173 N. W. 2d 175.

[14] *State v. Doyle, supra; State v. Phillips* (1952), 262 Wis. 303, 55 N. W. 2d 384.

door. Sheriff Check asked the roommate if he knew who the sheriff was. The roommate said, "Sure, you are the sheriff." The sheriff then asked if the defendant was home and the roommate replied, "He is in there," and pointed to another room in the apartment. The sheriff asked if he could go in there and the roommate answered, "Sure. Go ahead." The sheriff entered the room and discovered the defendant and a young lady standing next to the bed without any clothes on. The defendant and the young lady were immediately placed under arrest. The defendant was informed that he was being arrested for the murder of his parents, and both the defendant and the young lady were informed that they were being arrested for lewd and lascivious conduct. The sheriff testified that they were instructed to dress, and while they were dressing he advised them of their constitutional rights. The sheriff testified that he was convinced the defendant would be armed, in that he had used guns before in criminal acts and was accused of killing his parents with a pistol. The sheriff asked the defendant if he had any weapons in the house. Defendant indicated he did and pointed to some davenport cushions lying either on the bedroom floor or in an adjoining room.[15] The young lady was sitting on the cushions at this time and the sheriff asked her to stand up. She did, and the sheriff reached down, lifted the top cushion and found two pistols, including the weapon later admitted into evidence and identified as the murder weapon. The sheriff testified that he asked the defendant if he had any objection to the sheriff taking the weapons and the defendant replied that he did not. No other search was

[15] The record is in conflict. At trial, the sheriff testified that the defendant pointed to some curtains and said "[I]n there." At the evidentiary hearing on defendant's motion for new trial, the sheriff testified that the defendant pointed to some cushions on the bedroom floor.

made of the defendant's apartment by the officers at the time of arrest.

The reasons for even this limited search were stated by the sheriff in the following manner:

". . . I certainly felt if there was a gun I wanted my hands on it right then for the safety of the officers."

It is well settled that a search without warrant may be lawfully conducted if incident to lawful arrest. *Ker v. California, supra,* page 41; *Abel v. United States* (1960), 362 U. S. 217, 80 Sup. Ct. 683, 4 L. Ed. 2d 668; *Marron v. United States* (1927), 275 U. S. 192, 48 Sup. Ct. 74, 72 L. Ed. 231. However, the search must be "reasonable." *Carroll v. United States, supra.*

Since the events in issue took place in 1967, this court must assess the reasonableness of the search in terms of the law as it existed before *Chimel v. California* (1969), 395 U. S. 752, 89 Sup. Ct. 2034, 23 L. Ed. 2d 685, which substantially restricted the "search incident" exception to warrant requirement but did so only prospectively. *Williams v. United States* (1971), 401 U. S. 646, 91 Sup. Ct. 1148, 28 L. Ed. 2d 388.[16]

The search in this case was not a general exploratory search but was specifically directed to obtain whatever weapons the defendant or others in the apartment could use to effect the defendant's escape or otherwise endanger the safety of the officers.

When the arrest is valid and the search is an incident thereto, the search may extend beyond the person of the one arrested to include the premises within his immediate presence or control. *Jackson v. State* (1965), 29 Wis. 2d 225, 138 N. W. 2d 260; *Browne v. State, supra; State v. Phillips, supra; State v. Cox* (1950), 258 Wis. 162, 45 N. W. 2d 100; *United States v. Rabinowitz* (1950), 339

[16] *See also: Coolidge v. New Hampshire* (1971), 403 U. S. 443, 91 Sup. Ct. 2022, 29 L. Ed. 2d 564, rehearing denied, 404 U. S. 874, 92 Sup. Ct. 26, 30 L. Ed. 2d 120.

U. S. 56, 70 Sup. Ct. 430, 94 L. Ed. 653; *Harris v. United States* (1947), 331 U. S. 145, 67 Sup. Ct. 1098, 91 L. Ed. 1399, rehearing denied, 331 U. S. 867, 67 Sup. Ct. 1527, 91 L. Ed. 1871. The search of defendant's apartment was well within the limits upheld in *Harris v. United States, supra,* which also concerned a search of a private dwelling.

The pistol was seized during a reasonable search of the defendant's apartment as an incident of his lawful arrest. Its introduction into evidence at trial violated neither the fourth and fourteenth amendments of the United States Constitution nor art. I, sec. 11 of the Wisconsin Constitution.

*Defendant's presence at conference in chambers.*

The defendant contends that his rights under the fifth, sixth and fourteenth amendments of the United States Constitution and art. I, sec. 7 of the Wisconsin Constitution were violated in that he was not personally present during a pretrial conference in chambers between his counsel, the prosecutor and the trial judge. The defendant relies on *French v. State* (1893), 85 Wis. 400, 55 N. W. 566, wherein this court stated an accused has a right to be present during the whole trial and to meet the witnesses face to face and to be confronted with witnesses against him.

An accused has the right under art. I, sec. 7 of the Wisconsin Constitution and the sixth and fourteenth amendments of the United States Constitution to be present during his trial, and his right to be present at the trial includes the right to be present at proceedings before trial at which important steps in a criminal prosecution are often taken. *Beverly v. State* (1970), 47 Wis. 2d 725, 177 N. W. 2d 870; *Williams v. State* (1968), 40 Wis. 2d 154, 161 N. W. 2d 218; *Ramer v. State* (1968), 40 Wis. 2d 79, 161 N. W. 2d 209, certiorari denied, 394 U. S. 989,

89 Sup. Ct. 1476, 22 L. Ed. 2d 764. The presence of accused at all conferences has been recommended by this court. In *Ramer v. State, supra,* pages 85 and 86, this court stated:

"We think, however, that conferences of the court and attorneys outside the presence of the accused should be rarely held during the trial and the trial judge should be solicitous in allowing the defendant to be present at a conference in chambers when he requests it. There is always a risk of the conference exceeding a nonconstitutional scope or causing misunderstanding." [17]

However, the presence of defendant is constitutionally required only to the extent a fair and just hearing would be thwarted by his absence. *Ramer v. State, supra; Snyder v. Massachusetts* (1934), 291 U. S. 97, 54 Sup. Ct. 330, 78 L. Ed. 674, 90 A. L. R. 575. In *Stein v. United States* (9th Cir. 1962), 313 Fed. 2d 518, 522, the court stated:

"The presence of a defendant must bear a reasonably substantial relationship to the opportunity to defend. The Constitution does not assure 'the privilege of presence when presence would be useless, or the benefit but a shadow.' *Snyder v. Com. of Massachusetts* . . . ." [18]

---

[17] The American Bar Association Project on Minimum Standards for Criminal Justice in its Approved Draft, 1970, *Discovery and Procedure Before Trial,* pages 123, 124, sec. 5.4, **Pretrial Conference,** requires that the accused shall be present unless he waives this in writing. This standard was adopted by this court in *State v. Dickson* (1972), 53 Wis. 2d 532, 544, 545, 193 N. W. 2d 17, wherein this court held that implementation of this standard lies within the inherent power of the courts of general jurisdiction of this state. However, the events in issue in the case at bar occurred prior to this standard's adoption and it is not binding thereon.

[18] *See also: Cox v. United States* (8th Cir. 1962), 309 Fed. 2d 614; *Stegall v. United States* (D. C. Ky. 1957), 153 Fed. Supp. 844; affirmed (6th Cir.), 259 Fed. 2d 83; certiorari denied, 358 U. S. 886, 79 Sup. Ct. 128, 3 L. Ed. 2d 114; *People v. Isby* (1947), 30 Cal. 2d 879, 186 Pac. 2d 405.

In *Ramer v. State, supra,* page 84, this court stated, "whether the defendant has a right to attend a conference in chambers . . . admits of no categorical 'yes' or 'no' answer." Where the conference in chambers deals solely with questions of law or preliminary matters of procedure, it does not constitute a part of the trial in the constitutional sense. [19]

In the instant case, a conference in chambers was held on the morning of trial between counsel and the trial judge. Although the defendant asked to be present, he was excluded. At the conference, it was determined that the state would not elicit hearsay statements of the defendant's parents concerning their relationship to the defendant; the state indicated that it did not intend to introduce defendant's juvenile record at the trial; the manner and procedure for drawing the jury was determined; and certain *voir dire* questions for the jury were discussed, but no final form was stipulated or approved. The manner of withdrawal of defendant's "not guilty by reason of insanity" plea was also arranged. The record reveals that the plea was later withdrawn in open court in the absence of the jury, with the defendant present, and that the trial judge explained to the defendant the effect of the change.

The record also indicates that certain exhibits were marked and admitted into evidence, including the death certificates of Eugene and Mary Leroux.[20] There is nothing in the record to indicate that the exhibits were inadmissible. The admissibility of evidence is a question of law and any knowledge that the defendant may have had of the facts that his counsel did not have, would have

[19] *Ramer v. State, supra,* page 85; *Snyder v. Massachusetts, supra. See also:* Annot. (1962), *Presence at Trial—Law Argument,* 85 A. L. R. 2d 1111.

[20] In addition to the death certificates, autopsy reports, the report of a radiologist, and X rays of the bodies of the victims were marked and admitted into evidence.

been no aid to his counsel in the presentation of the questions of law.

The defendant contends that the cause of death was stipulated in the conference to be by gunshot, and that such a stipulation violated his substantial right to have every element of the crime proven at trial. Whether such a stipulation in conference would require defendant's presence need not be determined, in that the record reflects no such stipulation. Early in the conference, counsel for the defendant indicated his defense would be that, although the victims died of gunshot, the defendant is not guilty. However, no stipulations as to the cause of death were made. At trial, with the defendant present, the coroner testified, without objection, that the cause of death was trauma by bullet wound in the brain, hemorrhage, and due to gunshot.

Nothing was determined or discussed in the conference but matters preliminary in nature that dealt solely with questions of law. The conference did not constitute a part of the trial in the constitutional sense that required the defendant's presence. Furthermore, nothing that transpired in the conference was prejudicial or harmful to the defendant's cause.

*Alleged error occurring at trial.*

The defendant asserts the following alleged prejudicial errors, not involving constitutional matters, that occurred during the trial:

1. Jeannette testified that the defendant told her that he had been mistreated by their parents when he was in the Green Bay State Reformatory, thereby informing the jury of the defendant's juvenile record.

2. The defendant was required to answer a question which had to do with his release from parole, again introducing his juvenile record.

3. In describing the property taken from the house at the time of the fire, Jeannette identified an exhibit as the defendant's jewelry case, containing a Maltese Cross and Swastika.

4. Testimony was adduced at trial from the sheriff on direct-examination and the defendant on cross-examination to the effect that at the time of his arrest the defendant was standing next to a bed with a young lady and that both were unclothed.

5. Hearsay statements of Kathy Reinert, Mrs. Reinert and Mr. Olk were admitted into evidence.

The record reflects that the defendant made no objection at trial to the first and third allegations of error; that objection was made to the second and fifth allegations of error and sustained; and that objection to the fourth alleged error was overruled. The circuit court, in its decision on defendant's motion for a new trial, held that the inquiry into defendant's state of undress did not appear to be relevant, but that it did not feel that this was prejudicial error. We agree. Errors occurring in the course of trial will not serve to overturn a conviction unless it clearly appears that had they not occurred, the result would probably have been more favorable to the defendant. *Zebrowski v. State* (1971), 50 Wis. 2d 715, 185 N. W. 2d 545. If there were errors committed in the course of trial, they were harmless beyond a reasonable doubt.

## *Competency of counsel.*

The defendant in his pro se brief contends that the representation afforded at trial by his court-appointed counsel was so inadequate as to deprive the defendant of a fair trial. In support of this allegation, the defendant directs this court's attention to the fact that counsel failed to challenge the legality of defendant's arrest, or

attempt to suppress the pistol obtained in the search incidental thereto. At the evidentiary hearing held on defendant's motion for a new trial, counsel testified that he took no such action because he was unaware of the exclusionary rule of evidence and not as a trial tactic. While this may raise an inference of incompetent representation, incompetency of counsel is not ipso facto shown, particularly when we have determined that the arrest was lawful and the seizure of the weapons entirely justified and proper. The record in the instant case dispels any inference that the defendant was denied a fair trial as the result of the incompetency of counsel.

Defendant alleges other incidents of trial counsel's incompetence but examination of the entire record discloses that defendant's objections are fostered in his dissatisfaction in the verdict and an assumption that had trial counsel chosen different tactics the result would have been more favorable. As pointed out in *State v. Harper* (1973), 57 Wis. 2d 543, 205 N. W. 2d 1, "effective" and "adequate" counsel does not translate itself into a "not-guilty verdict." In his decision on defendant's motion for new trial, the circuit judge held that the testimony adduced at trial "overwhelmingly" proved defendant's guilt and that defendant's own testimony was, in part, "incredible." We concur in the trial court's observations.

While this court has previously held that a new trial will not be granted on the ground of inadequate representation unless counsel's performance is "so inadequate and of such low competency as to amount to no representation," [21] this court in *State v. Harper, supra,* adopted a higher standard as the test for competency of counsel. The court stated, at page 557:

"We think it is time for this court to restate a higher test for competency of counsel for the future. This court

[21] *Swonger v. State* (1972), 54 Wis. 2d 468, 195 N. W. 2d 598; *Quinn v. State* (1972), 53 Wis. 2d 821, 193 N. W. 2d 665; *Pulaski v. State* (1964), 23 Wis. 2d 138, 126 N. W. 2d 625.

has always been most solicitous of the right of one accused of crime to be properly and adequately represented by counsel. Effective representation is not to be equated, as some accused believe, with a not-guilty verdict. But the representation must be equal to that which the ordinarily prudent lawyer, skilled and versed in criminal law, would give to clients who had privately retained his services. . . ."

In the instant case, the record reflects that counsel conducted a vigorous and able defense throughout the trial proceedings demonstrating the quality of representation expected of a prudent and skilled lawyer, versed in criminal law.

*By the Court.*—Judgment and order affirmed.

BEILFUSS, J., took no part.