STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Tomas R. PAYANO-ROMAN, Defendant-Appellant.

Supreme Court

*No. 2004AP1029–CR. Oral argument February 22, 2006.
—Decided May 18, 2006.*

2006 WI 47

(Also reported in 714 N.W.2d 548.)

For the plaintiff-respondent-petitioner the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Timothy A. Provis,* Port Washington.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, State of Wisconsin, seeks review of a published court of appeals' decision that reversed a judgment convicting Tomas Payano-Roman of possession of heroin.[1] The State asserts that the court of appeals erred in overturning the circuit court's determination that the administration of a laxative to Payano-Roman was not a government search subject to the Fourth Amendment. It further asserts that, even if administration of the laxative was a government search, the search was reasonable.

¶ 2. We determine that the administration of the laxative that resulted in the recovery of a baggie of heroin from Payano-Roman's stool was a government search. However, we conclude that the search was reasonable. Therefore, Payano-Roman's Fourth Amendment rights were not violated. We reverse the court of appeals.

---

[1] *See State v. Payano-Roman,* 2005 WI App 118, 284 Wis. 2d 350, 701 N.W.2d 72 (reversing a judgment of the circuit court for Milwaukee County). Judge Clare L. Fiorenza presided over the suppression and plea proceedings in this case. Reserve Judge Russell W. Stamper presided at sentencing.

## I

¶ 3. The background facts are taken from testimony offered at the suppression hearing. We reference additional facts from the hearing as needed in the analysis portion of this opinion.

¶ 4. In April 2002, Milwaukee County Deputy Sheriff Scott Stiff and Special Agent Corey Parker were conducting surveillance of a residence at 1525 West Mitchell Street. They had received information from an informant that a person who went by the name "Mingo" was trafficking cocaine and possibly heroin out of a Toyota Tercel station wagon, license plate number T19401, parked outside the residence.

¶ 5. The officers observed a man matching the informant's physical description of "Mingo" come from the rear of the residence, enter a vehicle with another individual, then access the driver's compartment of a Tercel with license plate number T19401. The officers approached the man, who was Payano-Roman, and identified themselves as police.

¶ 6. From approximately four to six feet away, Deputy Stiff observed Payano-Roman look at him then put a clear plastic baggie containing a white powdery or chunky substance into his mouth. Based upon the packaging of the substance, Stiff believed it was heroin.

¶ 7. Payano-Roman began swallowing large amounts of air as if to swallow the baggie. The officers told him to spit out the baggie, and they attempted to recover it but were unsuccessful. They arrested Payano-Roman for possession of a controlled substance and placed him in handcuffs.

¶ 8. Deputy Stiff contacted his supervisor, who indicated he would call an ambulance. After the ambulance and a fire truck arrived at the scene, the officers

explained to the ambulance personnel and firefighters that Payano-Roman had possibly swallowed heroin. Payano-Roman was conveyed to a hospital, and Deputy Stiff rode in the ambulance with him.

¶ 9. The hospital staff asked for information so that they could provide appropriate medical treatment, and the officers explained to the staff what they had observed Payano-Roman ingest. Deputy Stiff was told by the staff that it was hospital policy to admit Payano-Roman for his safety because it could be fatal if the bag containing the suspected heroin broke. Similarly, Agent Parker was told that Payano-Roman was being admitted to the hospital for possible ingestion of a controlled substance that could lead to an overdose.

¶ 10. Payano-Roman was eventually placed in a private hospital room, where he remained handcuffed. At least one officer stayed with him at all times.

¶ 11. Starting at approximately 6:00 or 7:00 p.m., Payano-Roman was given a cup of a liquid laxative called "Go Lightly" to drink every twenty or thirty minutes.[2] He did not speak English, but a Spanish-speaking nurse explained to him how much of the laxative he would have to drink over a specific period of time. Agent Parker, who spoke some Spanish, gave Payano-Roman the laxative approximately six times, telling him "here you go, you got to take this again."

¶ 12. The officers advised hospital personnel that they wanted to examine Payano-Roman's stool, and the hospital provided a portable toilet. The officers told Payano-Roman that he had to use the portable toilet for defecation. Early the next morning, Payano-Roman had a bowel movement in the portable toilet, while one or

___

[2] The laxative is spelled "Go Lightly" in portions of the record. It appears that the proper spelling is "GoLYTELY."

both officers observed him from just outside his hospital room. Agent Parker examined Payano-Roman's stool and recovered the baggie. The contents in the baggie were later tested and determined to be heroin.

¶ 13. The State charged Payano-Roman with possession of heroin. He filed a motion seeking to suppress the evidence, arguing that the administration of the laxative constituted an unreasonable search under the Fourth Amendment. The State argued that the Fourth Amendment did not apply because it was the private action of hospital personnel that allowed the officers to find and recover the heroin. The circuit court ruled that Payano-Roman's Fourth Amendment rights were not violated because medical personnel made the decision to administer the laxative out of concern for his health. Payano-Roman then pled guilty but appealed the judgment of conviction.

¶ 14. The court of appeals reversed the judgment. It determined that the search was government action because the State failed to introduce testimony from qualified medical personnel demonstrating that the administration of the laxative was necessary to protect Payano-Roman's health. Thus, the court reasoned, the only logical conclusion was that the laxative was administered to assist police in recovering evidence. Applying a three-factor balancing test from *Winston v. Lee,* 470 U.S. 753 (1985), the court of appeals further determined that the search was unreasonable. The State petitioned for review.

II

¶ 15. This case presents two issues: (1) whether the administration of the laxative that resulted in the recovery of the baggie of heroin from Payano-Roman's

stool was a government search or a private search, and (2) whether, if the search was a government search, it was reasonable under the Fourth Amendment.

¶ 16. We apply a two-step standard of review when reviewing the mixed question of law and fact of whether a search is a private search or a government search. *See State v. Hajicek,* 2001 WI 3, ¶ 26, 240 Wis. 2d 349, 620 N.W.2d 781; *State v. Martwick,* 2000 WI 5, ¶ 16, 231 Wis. 2d 801, 604 N.W.2d 552. We will not overturn the circuit court's findings of evidentiary or historical fact unless clearly erroneous. *Hajicek,* 240 Wis. 2d 349, ¶ 15. However, we independently determine the ultimate question of whether the search was a government search or a private search. *See id.* Similarly, we apply the same two-step standard to the question of the reasonableness of a search. *State v. Trecroci,* 2001 WI App 126, ¶ 23, 246 Wis. 2d 261, 630 N.W.2d 555.[3]

---

[3] In *State v. Rogers,* 148 Wis. 2d 243, 247, 435 N.W.2d 275 (Ct. App. 1988), the court of appeals stated that the question of whether a search is a government search or a private search is a factual one, not to be disturbed unless clearly erroneous. The court in *Rogers* cited *State v. Bembenek,* 111 Wis. 2d 617, 634, 331 N.W.2d 616 (Ct. App. 1983), for this standard of review. Both *Rogers* and *Bembenek,* however, were decided before this court's decisions in *State v. Hajicek,* 2001 WI 3, ¶ 26, 240 Wis. 2d 349, 620 N.W.2d 781, and *State v. Martwick,* 2000 WI 5, 231 Wis. 2d 801, 604 N.W.2d 552. Under the reasoning of those decisions which pertain, respectively, to whether a search is a police search or a probation search and to curtilage determinations, the two-part standard of review should apply to the question of whether a search is a private search or a government search. Thus, the *Rogers* and *Bembenek* characterization of the question as one only of fact, not to be disturbed unless clearly erroneous, is no longer a complete statement of the standard of review.

¶ 17. We turn to address whether the administration of the laxative that resulted in the recovery of the baggie of heroin from Payano-Roman's stool constituted a government search or a private search. Private searches are not subject to the Fourth Amendment's protections because the Fourth Amendment applies only to government action. *State v. Rogers,* 148 Wis. 2d 243, 246, 435 N.W.2d 275 (Ct. App. 1988); *see also Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614 (1989).

¶ 18. The court of appeals in *Rogers* stated three requirements that must be met for a search to be a private search:

> (1) the police may not initiate, encourage or participate in the private entity's search; (2) the private entity must engage in the activity to further its own ends or purpose; and (3) the private entity must not conduct the search for the purpose of assisting governmental efforts.

*Rogers,* 148 Wis. 2d at 246.

¶ 19. Similarly, a search may be deemed a government search when it is a "joint endeavor" between private and government actors: "[C]ourts which have considered combined efforts of a government official and a private person in a search hold that a search is subject to the fourth amendment prohibition against an unreasonable search if the search is a joint endeavor involving a private person and a government official." *State v. Abdouch,* 434 N.W.2d 317, 325–26 (Neb. 1989); *accord* Wayne R. LaFave, 1 *Search and Seizure* § 1.8(b),

at 263 (4th ed. 2004) ("A search will also be deemed subject to Fourth Amendment restrictions if it is a 'joint endeavor,' involving both a private person and a government official . . . .") (footnote omitted).

¶ 20. At the same time, however, the mere presence of a government official will not necessarily transform a private search into government action. *Rogers,* 148 Wis. 2d at 246; *see also State v. Thompson,* 222 Wis. 2d 179, 193, 585 N.W.2d 905 (Ct. App. 1998) ("officer's presence during [the defendant]'s emergency treatment and surgery did not . . . constitute a search under the Fourth Amendment").

¶ 21. The question of whether a search is a private search or a government search is one that must be answered taking into consideration the totality of the circumstances. *Skinner,* 489 U.S. at 614–15; *United States v. Shahid,* 117 F.3d 322, 325 (7th Cir. 1997).

¶ 22. The State asserts that the court of appeals failed to recognize that Payano-Roman had the burden of proving government action. When analyzed properly, the State argues, the circuit court's "finding" that the administration of the laxative was a private action is not clearly erroneous.

¶ 23. We agree with the State that Payano-Roman had the burden of proof. Once the State raises the issue, asserting that a search is a private search, the defendant has the burden of proving by a preponderance of the evidence that government involvement in a search or seizure brought it within the protections of the Fourth Amendment. The weight of authority, including Wisconsin authority, holds that the burden is on a

defendant not the State. *See Shahid,* 117 F.3d at 325; *United States v. McAllister,* 18 F.3d 1412, 1417 (7th Cir. 1994); *United States v. Reed,* 15 F.3d 928, 931 (9th Cir. 1994); *United States v. Feffer,* 831 F.2d 734, 739 (7th Cir. 1987); *United States v. Coleman,* 628 F.2d 961, 965 (6th Cir. 1980); *Norton v. State,* 820 S.W.2d 272, 275 (Ark. 1991); *Waters v. State,* 575 A.2d 1244, 1247–48 (Md. 1990); *State v. Cohen,* 409 S.E.2d 383, 385 (S.C. 1991); *State v. Watts,* 750 P.2d 1219, 1221 (Utah 1988); *Rogers,* 148 Wis. 2d at 247; LaFave, 5 *Search and Seizure* § 11.2(b), at 48.

¶ 24. However, the circuit court's determination of whether the search was a private search or a government search is not a finding of evidentiary or historical fact. Rather, it is ultimately a question of law subject to independent appellate review. Thus, we must review all of the facts to determine whether the search was a private search or a government search, deferring to the circuit court's findings of historical or evidentiary fact and keeping in mind that Payano-Roman bore the burden of proof by a preponderance of the evidence.

¶ 25. The circuit court focused on whether it was the officers or the hospital staff who made the determination that Payano-Roman should be administered the laxative. It found that the officers did not dictate Payano-Roman's treatment and that it was the medical staff who made the decision to give Payano-Roman the laxative. These are findings of evidentiary fact which are supported by evidence in the record and, therefore, not clearly erroneous. Although the State did not call any hospital personnel as witnesses at the suppression hearing, both officers testified that they did not direct hospital personnel to administer the laxative to Payano-Roman. Deputy Stiff also testified that a nurse told him it was normal hospital procedure "to provide liquid . . .

to swallow in order to defecate and pass ... what [Payano-Roman] had swallowed." Payano-Roman did not undercut this testimony.

¶ 26. However, the circuit court's ultimate decision on the question of whether the administration of the laxative was a private search or a government search does not adequately account for the extent to which police officers participated in the search. It also does not fully recognize that the police and medical staff were engaged in a joint endeavor with a dual purpose: medical treatment and the recovery of evidence of a crime.

¶ 27. The circuit court's findings of fact and the officers' testimony establish that the circumstances surrounding the search included the following:[4]

- Payano-Roman swallowed the drugs in the course of a criminal drug investigation of which he was the target.

- He had been arrested and was in police custody at the time of the search.

- He remained handcuffed except when he had to defecate or urinate.

- One or more officers remained with Payano-Roman at all times, including in the ambulance on the way to the hospital.

- Although medical personnel made the determination that Payano-Roman should receive the laxative, Agent Parker directly participated in its administra-

---

[4] Payano-Roman was also a witness at the suppression hearing. The circuit court found that his testimony was not credible, and we do not rely on it.

393

tion. He testified that he gave the laxative to Payano-Roman approximately six times, telling Payano-Roman "here you go, you got to take this again."

- The officers were concerned with Payano-Roman's well-being, but also intent on recovering the heroin as evidence of a crime.

- In light of the officers' goal to recover evidence, they requested that they be allowed to examine Payano-Roman's stool. The hospital staff then provided a portable toilet for Payano-Roman's hospital room.

- The officers told Payano-Roman he had to use the portable toilet for defecation, observed his bowel movement, then examined his stool and recovered the baggie of heroin.[5]

¶ 28. Taking all of these circumstances into account, we determine that Payano-Roman established by a preponderance of the evidence that the search meets the test for a government search. The totality of the facts shows that the officers and medical personnel were engaged in a joint endeavor to speed the passage of the baggie of drugs through Payano-Roman's system. The administration of the laxative had a dual purpose, medical treatment and the recovery of evidence of a crime.[6] Moreover, Agent Parker directly participated in the administration of the laxative to Payano-Roman.

---

[5] This fact suggests that, by the time Payano-Roman defecated in the portable toilet if not before, the focus of the laxative's administration had become recovery of the evidence, not concern for his health. We note that the State points to no evidence in the record showing whether (and, if so, when) medical personnel examined the baggie to determine whether it had ruptured and whether any additional course of action may have been medically indicated.

[6] *Cf. State v. Jenkins*, 80 Wis. 2d 426, 433–34, 259 N.W.2d 109 (1977) (holding that where a blood test is taken at the

This is not a case involving the "mere presence" of a police officer.

¶ 29. There can be no question on this record that one purpose of the laxative procedure was medical treatment. However, when we consider all the circumstances of this case, we conclude that the medical purpose of the procedure cannot insulate the simultaneous evidence-gathering purpose from Fourth Amendment scrutiny.

IV

¶ 30. Because we have determined that the search was a government search, we must address the question of whether it was reasonable under the Fourth Amendment. The officers made no attempt to obtain a warrant to search Payano-Roman. Warrantless searches are per se unreasonable under the Fourth Amendment subject to certain exceptions that are "jealously and carefully drawn." *State v. Boggess,* 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983) (quoting *Jones v. United States,* 357 U.S. 493, 499 (1958)). The government bears the burden of proving that a warrantless search falls within one of the narrowly drawn exceptions. *State v. Rome,* 2000 WI App 243, ¶ 11, 239 Wis. 2d 491, 620 N.W.2d 225.

¶ 31. One of the exceptions to the warrant requirement is a search incident to a lawful arrest. *Leroux v. State* 58 Wis. 2d 671, 688, 207 N.W.2d 589 (1973); *Rome,* 239 Wis. 2d 491, ¶ 11; *see also* Wis. Stat.

---

request of a physician "solely" for diagnostic purposes, there is no search and seizure within the meaning of the Fourth Amendment).

§ 968.11 (2003–04).[7] A lawful arrest gives rise to heightened concerns that may justify a warrantless search, including the need to discover and preserve evidence. *State v. Pallone,* 2000 WI 77, ¶ 32, 236 Wis. 2d 162, 180, 613 N.W.2d 568.

¶ 32. Another exception to the warrant requirement is exigent circumstances. This exception requires an inquiry into whether officers might reasonably have believed that they were confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence. *State v. Faust,* 2004 WI 99, ¶ 12, 274 Wis. 2d 183, 682 N.W.2d 371.

¶ 33. The record is unclear as to whether the officers reasonably believed that they were confronted with an emergency, in which the delay necessary to obtain a warrant threatened the destruction of evidence. However, the parties no longer dispute whether Payano-Roman was under lawful arrest at the time of the search. Thus, at least one exception to the warrant requirement is present.[8]

---

[7] Wisconsin Stat. § 968.11 provides as follows:

> Scope of search incident to lawful arrest. When a lawful arrest is made, a law enforcement officer may reasonably search the person arrested and an area within such person's immediate presence for the purpose of:
>
> . . . .
>
> (3) Discovering and seizing the fruits of the crime; or
>
> (4) Discovering and seizing any instruments, articles or things which may have been used in the commission of, or which may constitute evidence of, the offense.

[8] Because one exception to the warrant requirement is sufficient, we need not rely on the exigent circumstances

¶ 34. Still, this does not end our inquiry. The scope and nature of a warrantless search fitting one of the warrant exceptions must meet the reasonableness requirements of the Fourth Amendment. *See Leroux,* 58 Wis. 2d at 688.

¶ 35. Relying primarily on a case involving a border search,[9] the State asserts that the use of the laxative was reasonable because the State was entitled to detain Payano-Roman until he had a bowel movement. However, border search jurisprudence is not dispositive because "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez,* 473 U.S. 531, 538 (1985); *see also, e.g., Torres v. Puerto Rico,* 442 U.S. 465, 473 (1979); *United States v. Ramsey,* 431 U.S. 606, 620 (1977). Moreover, the officers here did not simply detain Payano-Roman until he had a bowel movement. Rather, he was given a laxative that resulted in the recovery of the baggie of heroin from his stool.

¶ 36. More helpful than border search jurisprudence is *Winston v. Lee,* 470 U.S. 753 (1985), the case under which the State makes its backup argument. The court of appeals analyzed the reasonableness of the search under *Winston,* as does Payano-Roman.

¶ 37. In *Winston,* the United States Supreme Court applied a three-factor balancing test to determine

exception. The dissent concedes that a search incident to arrest is excepted from the warrant requirement if the search was reasonable under the circumstances. Dissent, ¶ 78.

[9] *United States v. Adekunle,* 980 F.2d 985 (5th Cir. 1992), *vacated in part, revised and reinstated as revised,* 2 F.3d 559 (5th Cir. 1993).

the reasonableness of a search involving a medical procedure that intruded on a criminal suspect's bodily integrity. Under that test, courts examine (1) the extent to which the procedure may threaten the safety or health of the individual and (2) the extent of the intrusion upon the individual's dignitary interests in personal privacy and bodily integrity. *Winston,* 470 U.S. at 761–62. They then weigh these two factors against (3) the community's interest in fairly and accurately determining guilt or innocence. *Id.* at 762.[10] The balance "is a delicate one admitting of few categorical answers." *Id.* at 760.

¶ 38. We agree with the court of appeals, Payano-Roman, and the State in its backup argument that *Winston* provides a useful framework for the case at bar. The *Winston* test recognizes that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Winston,* 470 U.S. at 760 (quoting *Schmerber v. California,* 384 U.S. 757, 767 (1966)). The Fourth Amendment neither forbids nor permits all bodily intrusions. *Winston,* 470 U.S. at 760. Rather, the Amendment's function is to constrain against intrusions "which are not justified in the circumstances, or which are made in an improper manner." *Id.* (quoting *Schmerber,* 384 U.S. at 768).

¶ 39. Other courts have applied *Winston* to determine the reasonableness of a search involving a medical procedure that intrudes on an individual's bodily integ-

---

[10] *Winston v. Lee,* 470 U.S. 753 (1985), involved the question of whether a state could compel a suspect to undergo surgery to remove a bullet believed to be evidence of a crime. *Winston,* 470 U.S. at 756, 758. Removal of the bullet was neither something the suspect wanted nor, apparently, medically prescribed.

rity.[11] One useful example is the Iowa Supreme Court's decision in *State v. Strong*, 493 N.W.2d 834 (Iowa 1992).

¶ 40. In *Strong*, police observed the defendant place some small objects in his mouth as they approached him to investigate a fight. *Strong*, 493 N.W.2d at 835. The defendant eventually swallowed the objects but the officers were able to see several small pieces of a rock-like substance that appeared to be crack cocaine. *Id.* The defendant then admitted that he had swallowed crack cocaine. *Id.* The officers took him to the hospital and, without obtaining a warrant, requested that medical personnel pump his stomach. *Id.* The crack cocaine was recovered as a result of the stomach pumping. *Id.*

¶ 41. The court determined that the case implicated both the exigent-circumstances and search-incident-to-arrest exceptions to the warrant requirement.[12] *Id.* at 836–37. However, the court explained, that determination did not end its analysis: "When the warrantless search involves an intrusion into the body, a more demanding test must be met." *Id.* at 837. "We must be satisfied that the method chosen to search [the defendant]'s stomach contents was reasonable." *Id.* Accordingly, the court applied the *Winston* factors. *See id.*

---

[11] *United States v. Husband*, 226 F.3d 626, 630–33 (7th Cir. 2000); *State v. Strong*, 493 N.W.2d 834 (Iowa 1992); *Hendrix v. State*, 843 So. 2d 1003, 1005–06, 1008–10 (Fla. Dist. Ct. App. 2003). For additional cases involving Fourth Amendment challenges to the admissibility of evidence under related factual scenarios, see *United States v. Nelson*, 36 F.3d 758 (8th Cir. 1994), *United States v. Borchardt*, 809 F.2d 1115 (5th Cir. 1987), *People v. Bracamonte*, 540 P.2d 624 (Cal. 1975), and *State v. Brockman*, 439 N.W.2d 84 (Neb. 1989).

[12] One difference between *Strong* and the case at bar is that in *Strong* the drugs that the defendant swallowed were not in a container.

at 837–38. It concluded there was no Fourth Amendment violation after considering all the circumstances. *Id.* at 838.

¶ 42. Like the Iowa Supreme Court, we conclude that even when one or more of the warrant exceptions is present, an intrusion into the body demands something more: The scope and nature of the intrusion must be reasonable. The reasonableness of a search depends upon all of the circumstances, *see, e.g., State v. Rewolinski,* 159 Wis. 2d 1, 13, 464 N.W.2d 401 (1990), and the *Winston* factors help inform the reasonableness inquiry. The State bears the burden of proof as to the reasonableness of the search.[13]

¶ 43. Applying the factors of *Winston,* we begin by considering the extent to which the administration of the laxative threatened Payano-Roman's safety or health. Important to our determination in this case is that the evidence before the circuit court relevant to this factor showed that the laxative procedure was medically indicated for Payano-Roman's safety and health. There was no evidence before the court that the administration of the laxative posed a threat to his safety or health.

---

[13] Although *Winston* does not expressly address whether the State or defendant bears the burden of proof, it suggests that the burden is on the State. *See Winston,* 470 U.S. at 766. In any event, placing the burden on the State to show reasonableness is required by other Fourth Amendment jurisprudence. *See, e.g., State v. Rome,* 2000 WI App 243, ¶ 11, 239 Wis. 2d 491, 620 N.W.2d 225 ("The State bears the burden of proving that the warrantless search falls within one of these narrowly drawn exceptions."); *see also Strong,* 493 N.W.2d at 836 ("The State must prove the legality of the search and seizure by a preponderance of the evidence.").

¶ 44. As already explained, the circuit court made well-supported findings that the officers did not dictate Payano-Roman's treatment and that it was the medical staff who made the decision to give Payano-Roman the laxative. Deputy Stiff testified that a nurse told him it was normal hospital procedure "to provide liquid . . . to swallow in order to defecate and pass . . . what [Payano-Roman] had swallowed." In addition, Agent Parker testified there were "several conversations" among hospital personnel regarding the laxative. He further testified that the initial discussion about the laxative involved an emergency room physician and one or two nurses.

¶ 45. Payano-Roman did not undercut the State's evidence. He introduced no evidence that the laxative presented any particular risk to his safety or health. Similarly, he brought forth no evidence that the laxative was administered in a manner or under circumstances that may have put his health at risk.

¶ 46. The State's evidence also showed that the laxative was administered in a hospital environment with supervision by medical personnel. Payano-Roman presented no evidence that the administration of the laxative involved an unusual or untested procedure, or that the laxative was given in a manner that deviated from accepted medical practices. We recognize, of course, that the administration of virtually any drug, or the performance of virtually any medical procedure, presents at least some amount of minimal risk. However, we have no reason on this record to determine that the laxative presented anything beyond a negligible risk to Payano-Roman.

¶ 47. We stress that courts should generally not assume, without evidence, that a particular procedure is medically indicated in a given case. A review of the case law suggests that what is medically indicated may,

as one might expect, vary under the circumstances. *See, e.g., Hendrix v. State,* 843 So. 2d 1003, 1006 (Fla. Dist. Ct. App. 2003) (physicians testified that administration of laxative to individual who had swallowed a large baggie of cocaine was "absolutely necessary"); *but see Blefare v. United States,* 362 F.2d 870, 873 (9th Cir. 1966) (physician testified that reliance on laxatives "would be dangerous," apparently because relatively large packets of drugs might not pass from the stomach to the small intestine); *cf. People v. Bracamonte,* 540 P.2d 624, 631 (Cal. 1975) (suggesting that rubber containers of drugs "may pass completely through the digestive tract, by the ordinary process of nature, without causing any ill effects" and that such containers "would effectively prevent the contents from being absorbed into the system").

¶ 48. Thus, in many cases, it may be necessary for the State to call one or more appropriate medically qualified witnesses. The court of appeals' concern with the absence of qualified medical evidence in this case is understandable. However, we are satisfied that the record in this case demonstrates that administration of the laxative was medically appropriate and presented no appreciable risk to Payano-Roman's safety or health. Rather, the evidence showed that the procedure was medically indicated to preserve his safety and health.

■■■

¶ 49. Next, we apply the second *Winston* factor, inquiring into the extent of the intrusion upon Payano-Roman's dignitary interests in personal privacy and bodily integrity. "The Fourth Amendment protects against damage to 'the individual's sense of personal privacy and security,' regardless of whether the intrusion 'injure[s] the physical person of the individual.' "

*United States v. Husband,* 226 F.3d 626, 632 (7th Cir. 2000) (quoting *Winston,* 470 U.S. at 761–62).

¶ 50. The administration of the laxative to Payano-Roman was more than a negligible intrusion into his dignitary interests in personal privacy and bodily integrity. According to Agent Parker's testimony, Payano-Roman was required every 20 or 30 minutes to drink either 12 or 20 ounces of the laxative over the course of several overnight hours. As part of the laxative procedure, Payano-Roman was then made to defecate while police observed. Parker testified that, after Payano-Roman said he would have a bowel movement more easily if people were not in the room, Parker and Deputy Stiff would step into the hallway, partially shut the door, and watch Payano-Roman through a window in the door. The officers then examined his stool in order to recover the baggie of heroin.

¶ 51. The Supreme Court has recognized that "[t]here are few activities in our society more personal or private than the passing of urine." *Skinner,* 489 U.S. at 617 (quoting *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 175 (5th Cir. 1987)). The same must be said for the human body's other primary excretory function.

¶ 52. Thus, the laxative procedure resulting in the recovery of the baggie of heroin from Payano-Roman's stool was a significant intrusion on his dignitary interests. However, we note that Payano-Roman's bodily integrity would have been compromised if the baggie containing heroin had ruptured while inside him. Waiting until he passed the baggie, without the administration of the laxative, would have apparently lengthened the time that he was exposed to this danger.

403

¶ 53. We turn to the third *Winston* factor, the community's interest in fairly and accurately determining guilt or innocence. Considerations relevant to this factor include whether there is a clear indication that the procedure will produce evidence of a crime; whether the procedure is an effective means of obtaining the expected evidence; the risk, absent the procedure, that the evidence will be destroyed; and the difficulty the government would have in proving its case without using the procedure to obtain the expected evidence. *See Winston,* 470 U.S. at 762–63; *Husband,* 226 F.3d at 633; *Hendrix,* 843 So. 2d at 1009; *Strong,* 493 N.W.2d at 838.

¶ 54. On the record before us, it cannot be disputed that there was a clear indication that administration of the laxative would produce evidence of a crime. We highlight some of the relevant facts: the officers had information from an informant that the man who turned out to be Payano-Roman was trafficking in cocaine and possibly heroin; the officers' observations confirmed information the informant provided, including Payano-Roman's physical description, his location at a particular address, and his association with a Toyota Tercel with license plate T19401; and Deputy Stiff, who had experience and training as part of a drug enforcement unit, saw Payano-Roman swallow a clear plastic baggie containing a white powdery or chunky substance that he believed to be heroin in light of its packaging. There also can be no real dispute on this record that the procedure was an effective means of obtaining the expected evidence.

¶ 55. The record is not conclusive as to the likelihood that the heroin in the baggie would have been destroyed, absent the administration of the laxative to Payano-Roman. What evidence the record does contain

suggests that without the laxative, there was increased risk that the baggie would rupture, resulting in the absorption of some or all of the heroin into Payano-Roman's system. This is suggested both by the circuit court's finding that medical personnel made the determination to administer the laxative and by the testimony that it was hospital procedure.

¶ 56. This same evidence suggests that there may have been an increased risk that the government would have had more difficulty in proving its case without use of the laxative. Had the officers been unable to recover the heroin, the government's case against Payano-Roman would not have been as strong.

¶ 57. At the same time, it cannot be ignored that Payano-Roman's situation was self-created insofar as he swallowed the baggie of heroin in an apparent attempt to conceal or dispose of evidence. In our view, this should be a consideration in the balancing of the *Winston* factors.

¶ 58. We also recognize that the officers acted, at least in part, out of concern for Payano-Roman's well-being. Indeed, had the officers not initially sought at least some form of medical attention for Payano-Roman, they may have been derelict in their duties. These circumstances tend to support a determination that the search in this case was reasonable.

¶ 59. Taking into consideration all of the facts, and considering the three *Winston* factors, we conclude that the State met its burden to show that the administration of the laxative that resulted in the recovery of the baggie of heroin from Payano-Roman's stool was reasonable. In weighing (1) the extent to which the laxative procedure threatened Payano-Roman's safety or health and (2) the extent of the intrusion upon his dignitary interests against (3) the community's interest

in fairly and accurately determining guilt or innocence, we determine that the balance tips in favor of the State.

¶ 60. Weighing heavily in our determination is that the State's evidence showed that the administration of the laxative was medically indicated and likely reduced the health risks to Payano-Roman. He presented no evidence suggesting otherwise. Thus, in this case, the first *Winston* factor actually favors the State.

¶ 61. Although the laxative procedure resulting in the recovery of the baggie of heroin from Payano-Roman's stool was a significant intrusion on his dignitary interests, that intrusion was justified under the circumstances here. Not only does the record suggest that the procedure was medically appropriate, but also it shows that the officers had a clear indication that Payano-Roman's stool would contain evidence of a crime. They were justified in seeking to preserve the evidence to facilitate the community's interest in determining guilt, which would have been more difficult in Payano-Roman's case had the police not recovered the baggie of heroin. In short, balancing the *Winston* factors as applied to the circumstances here leads us to the conclusion that the search was reasonable.

¶ 62. Although we conclude that the search in this case was reasonable, this is not to say that the administration of a laxative in all future cases will be reasonable. It bears repeating that we arrive at our conclusion based on the totality of circumstances presented. As the United States Supreme Court said in *Schmerber,* "[t]hat we today hold that the Constitution does not forbid . . . minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Schmerber,* 384 U.S. at 772.

## V

¶ 63. In sum, we determine that the administration of the laxative that resulted in the recovery of a baggie of heroin from Payano-Roman's stool was a government search. However, we also determine that the search was reasonable and therefore not in violation of Payano-Roman's Fourth Amendment rights.[14] Accordingly, we reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 64. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I agree with the court of appeals that the evidence obtained as a result of administering the laxative to the defendant, Tomas Payano-Roman, should have been suppressed. Six hours elapsed between the arrest and the administration of the laxative—more than enough time for the officers to get a search warrant. The officers did not try to get a search warrant. The evidence must be suppressed.

¶ 65. I agree with the majority opinion that the administration of the laxative was state action for the purposes of Fourth Amendment search and seizure analysis. I disagree, however, that the administration of laxatives constituted a reasonable search.

¶ 66. The purpose of a warrant is to allow a neutral decision-maker to make an informed, deliberative decision about whether the search is reasonable under the circumstances.[1] A warrantless search is per se unreasonable under the Fourth Amendment unless it

---

[14] We need not reach the State's alternative argument that the baggie of heroin should be admissible under the inevitable discovery doctrine.

[1] 2 Wayne R. LaFave, *Search and Seizure* § 4.1(a), at 441–42 (4th ed. 2004).

falls within an exception to the warrant requirement.[2] The State has the burden of proof that an exception to the warrant requirement exists.[3]

¶ 67. The State argues that the exigent circumstances exception applies. The majority opinion does not address this exception; it concludes that the administration of the laxative to the defendant was reasonable because the circumstances meet the search incident to arrest exception to the warrant requirement.

¶ 68. To prove exigent circumstances, the State must show that the delay in obtaining a warrant would jeopardize seizure of the evidence sought. This exception applies if reasonable officers would have believed that they were confronted with an emergency that threatened to destroy the evidence.[4]

¶ 69. The second exception to the warrant requirement, upon which the majority relies, is that police may conduct a search incident to arrest without a warrant so long as that search is reasonable considering all the attending circumstances.[5]

¶ 70. I conclude neither exception to the warrant requirement applies in the present case. I address each of these exceptions in turn.

¶ 71. Finally, I discuss the *Winston* and *Schmerber* cases upon which the majority opinion relies. Those cases do not support the majority's conclusion.

---

[2] *State v. Boggess,* 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983) (citing *Cady v. Dombrowski,* 413 U.S. 433, 439 (1973)).

[3] *State v. Pallone,* 2000 WI 77, ¶ 29, 236 Wis. 2d 162, 613 N.W.2d 568 ("The State bears the burden of proving that a warrantless search falls under one of the established exceptions.").

[4] *State v. Faust,* 2004 WI 99, ¶ 12, 274 Wis. 2d 183, 682 N.W.2d 371; *see* majority op., ¶ 32.

[5] *Ker v. California,* 374 U.S. 23, 32–33 (1963).

## I

¶ 72. The State proffers two exigent circumstances to justify the warrantless administration of the laxative: (1) to recover the heroin in the plastic bag for use as evidence; and (2) to provide medical care to the defendant, in the belief that his health was in danger if the plastic bag ruptured inside his body.[6] Though either of these situations may produce exigent circumstances in the proper case, the State has not proven either exigency in the instant case. Although the majority opinion does not address exigent circumstances, I do because the existence of exigent circumstances (or lack thereof) is important to evaluate the reasonableness of the search incident to arrest.

¶ 73. The argument that the evidence might be lost unless an expedited search occurred does not constitute exigent circumstances under the facts of the instant case. Approximately six hours passed between the time of the arrest and the time the laxative was administered. If the officers were concerned about the defendant's health why did it take them so long to act? Furthermore, six hours was more than enough time to get a warrant.[7] Yet the officers failed to secure a warrant during this six-hour period.

¶ 74. The second putative justification for applying the exigent circumstances exception is medical necessity. The argument is made that the plastic bag might have ruptured, endangering the defendant's life. This putative necessity is not applicable in the instant case. The record indicates that it took between 45

---

[6] *See* majority op., ¶¶ 54–55, 59.

[7] Approximately sixteen hours elapsed between the arrest and the time the defendant defecated the plastic bag containing heroin.

minutes and two hours to transfer the defendant to the hospital after he was arrested. A total of six hours passed before the laxative was administered. If the defendant was at such great risk, why did it take six hours to administer the laxative? As I explain fully later, the State did not prove that the administration of the laxative was necessary to protect the defendant's health.[8] No exigent circumstances exist here excusing the need for a search warrant.

¶ 75. Furthermore, an individual may choose not to accept medical treatment. Individuals have a constitutional right to refuse medical treatment. This right is often analyzed under general privacy principles, but more properly is analyzed under the Fourteenth Amendment liberty guarantee.[9] Had the defendant not been under arrest, he surely would have been permitted

---

[8] *See* ¶¶ 85–90, *infra.*

[9] *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 279 & n.7 (1990) ("Although many state courts have held that a right to refuse treatment is encompassed by a generalized constitutional right of privacy, we have never so held. We believe this issue is more properly analyzed in terms of a Fourteenth Amendment liberty interest."; whether a person's constitutional interests have been violated is determined by balancing the liberty interests against the relevant state interests); *Lenz v. L.E. Phillips Career Ctr.,* 167 Wis. 2d 53, 67, 482 N.W.2d 60 (1992) ("[A]n individual's right to refuse unwanted medical treatment emanates from the common law right of self-determination and informed consent, the personal liberties protected by the Fourteenth Amendment, and from the guarantee of liberty in Article I, section 1 of the Wisconsin Constitution").

The right to refuse medical treatment also comes from the common law torts of assault and battery. *Mills v. Rogers,* 457 U.S. 291, 294 n.4 (1982) ("Under the common law of torts, the right to refuse any medical treatment emerged from the doc-

to refuse a laxative if he had ingested a dangerous material. No authority is cited for the proposition that an arrest negates the need for a person's consent for medical treatment or for a showing of medical necessity.

¶ 76. In the instant case, the medical excuse for the search fails to establish the reasonableness of the search. The State has failed to meet its burden of proof on this exception to the warrant requirement.

¶ 77. In sum, the record is such that the State failed to meet its burden that the search was reasonable.

II

¶ 78. I also conclude that the search incident to arrest exception to the warrant requirement was not met in the instant case. A search incident to arrest is excepted from the warrant requirement if the search was reasonable under the circumstances.[10] The warrantless search was not reasonable under the circumstances of the present case.

¶ 79. A search incident to arrest is reasonable under the circumstances if the search is necessary either to seize evidence or prevent dangerous materials from circulating in a secure environment such as a jail.[11] An essential element of this determination is whether the officers had sufficient time to obtain a

---

trines of trespass and battery, which were applied to unauthorized touchings by a physician.").

For statutes protecting the rights to medical care of certain patients whose liberty has been restricted, see Wis. Stat. §§ 50.09, 51.61.

[10] *Ker v. California*, 374 U.S. 23, 32–33 (1963).

[11] *Chimel v. California*, 395 U.S. 752, 755–63 (1969).

411

search warrant.[12] Here the search (the administration of the laxative) was not necessary; the natural course of human events would have delivered the plastic bag and its contents to the police. In the instant case, the search was not needed to prevent the drugs from circulating to others. The evidentiary and security purposes of the search incident to arrest exception did not require the administration of the laxative without a search warrant. The State has failed to meet its burden of proof on this exception to the warrant requirement.

¶ 80. In sum, the record is such that the State failed to meet its burden that the search was reasonable.

---

[12] *Chimel,* 395 U.S. at 755–63.

The *Chimel* Court observed:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

*Id.* at 762–63 (footnote omitted).

## III

¶ 81. The two United States Supreme Court cases upon which the majority opinion relies do not support the majority's conclusion in the present case.

¶ 82. In *Winston v. Lee,* 470 U.S. 753 (1985), the United States Supreme Court addressed a fact pattern similar to that of the instant case. In *Winston,* the perpetrator of an armed robbery was shot by the victim in self-defense. Approximately 20 minutes after the incident, the defendant was arrested with a bullet wound. Although there was no medical reason to remove the bullet, the State petitioned the state courts to order the bullet removed so that it might be used as evidence against the defendant. The Virginia courts granted the petition. Upon petition for habeas corpus, the federal district court and the federal Fourth Circuit Court of Appeals enjoined the surgery.

¶ 83. On certiorari, the United States Supreme Court affirmed the denial of the State's request for surgery.[13] In reaching this conclusion, the Supreme Court stated a three-part balancing test for evaluating whether exigent circumstances justify a search involving bodily invasion. The Supreme Court balanced (1) the extent to which the procedure may threaten the health and safety of the defendant; (2) the extent of the intrusion upon the defendant's dignitary interests in personal privacy and bodily integrity; and (3) the community's interest in fairly and accurately determining guilt or innocence.[14]

¶ 84. In *Winston,* removal of the bullet was not medically necessary and the evidence was not critical

---

[13] *Winston v. Lee,* 470 U.S. 753, 760–63 (1985).

[14] *Winston,* 470 U.S. at 764–66; majority op., ¶ 37.

for a conviction.[15] The *Winston* Court placed great emphasis on the bodily integrity of the individual in reaching its decision.[16]

¶ 85. As to the first *Winston* factor, the record in the instant case fails to establish whether the procedure would endanger the defendant's health. In the present case, an analogous consideration is whether the procedure was necessary to protect his health. The burden is on the State to justify a warrantless intrusion on the basis of the defendant's health. In the absence of evidence on the record, this first element under *Winston* weighs against the State.

¶ 86. The only evidence in the record demonstrating that the laxative was medically indicated is the hearsay testimony of the officers that a nurse said that the typical procedure in the hospital for such cases was to administer a laxative. Even if this hearsay testimony is accurate and reliable, it does nothing to establish that the laxative was medically indicated for this defendant.

¶ 87. Medical treatment requires an individual approach. Nothing on the record indicates that the defendant was asked about any medical condition he might have that might be affected by a laxative, about any allergy to laxatives, about the nature of the plastic bag, or about its contents. In sum, the record is silent about whether the laxative administered was medically indicated or was medically appropriate for the defendant.

¶ 88. Furthermore, the record does not demonstrate that the laxative was administered under the supervision of qualified medical personnel. The record is extremely limited regarding the involvement of a

[15] *See Winston,* 470 U.S. at 765.
[16] *See id.* at 764–65.

doctor in the decision-making regarding the defendant's care.[17] The only clear testimony is that a doctor was present during the initial consultation with the police officers in the emergency room. The record is unclear whether a doctor ever met with or examined the defendant. No doctor is named. Moreover, no testimony exists that the administration of the laxative was at a doctor's behest. The closest the record comes to establishing a doctor's involvement is the following statement by Special Agent Parker at the suppression hearing:

> I don't recall if—if he [the doctor]—I believe he also had told—said the same thing, but it was consistent, if both said something to that effect to me, it was definitely consistent, that the fluids that Mr. Payano would drink would allow for things to pass through him much more rapidly than otherwise.

¶ 89. As is clear, Special Agent Parker never testified that the doctor recommended the laxative. Rather, he testified only that, if the doctor said anything to him about that subject, it was not inconsistent with what a nurse told him.

¶ 90. The record is thus weak in demonstrating that the laxative did not threaten the health and safety of the defendant or that the procedure was needed to protect his health.

¶ 91. As to *Winston*'s second factor: The administration of a laxative was far less intrusive upon the defendant's dignitary interests in personal privacy and bodily integrity than the medical procedure contemplated in *Winston*. Nevertheless, the defendant's bodily integrity in the present case is entitled to great weight,

---

[17] *See* majority op., ¶ 44 (discussing the record upon which the majority relies).

as the majority opinion properly explains. The defendant has a substantial interest in determining his own medical care and determining the medical procedures to be performed.

¶ 92. In sum, the record shows that the defendant's dignitary and privacy interests are substantial in the present case.

¶ 93. As to *Winston*'s third factor, a defendant's bodily integrity should not be breached absent a showing by the State of a compelling need for the evidence sought.[18] The State's interest in recovering the drugs is not very strong in the present case. Although in the instant case the criminal case may be weaker without the recovered heroin, the State nonetheless could have charged and prosecuted the defendant based on testimony of the police officers and other witnesses regarding the defendant's conduct.

¶ 94. Furthermore, absent any evidence on the record to the contrary, there is no reason to think that the defendant would not have eventually passed the plastic bags, at which point the police officers present would have been able to recover the heroin for use against the defendant at a trial. Because the record fails to establish that no less intrusive means of recovering the evidence was available, administration of the laxative was unreasonable.[19]

---

[18] *Winston,* 470 U.S. at 766; 2 LaFave, *supra* note 1, § 3.2(a), at 29–30.

[19] *See United States v. Cameron,* 538 F.2d 254, 258 (9th Cir. 1976) ("[L]ess intrusive means of obtaining the evidence may properly have been considered. In time, the contraband in the rectal cavity might have been eliminated naturally."); *Colorado v. Thompson,* 820 P.2d 1160, 1165 (Colo. Ct. App. 1991) (citing *Cameron,* 538 F.2d 254) ("[D]efendant was constitutionally

¶ 95. I therefore conclude that the defendant's health and dignitary interests were significant and the State's interests in protecting the defendant's health and welfare and securing the evidence through this means were not strong.

¶ 96. The instant case does not meet *Winston*'s stringent standards for invasion of the body. If the Supreme Court refused to authorize an invasion of the body in *Winston,* clearly law enforcement officers cannot, without a warrant, authorize the administration of laxatives in the present case.

¶ 97. In *Schmerber v. California,* 384 U.S. 757 (1966), the U.S. Supreme Court addressed the admissibility of blood withdrawn from an individual suspected of driving while intoxicated. The blood was withdrawn in a hospital by a physician while the suspect was unconscious.[20]

¶ 98. Applying the same balancing test that was later applied in *Winston,* the United States Supreme Court affirmed the admissibility of the blood.[21] The Court concluded that it would have taken too long to obtain a warrant and evidence of blood alcohol content, an essential aspect of the State's case against the defendant, would have dissipated in the interim.[22]

¶ 99. The facts of *Schmerber* are distinguishable from the facts of the instant case. The blood test was

---

entitled to a court ruling whether a less intrusive means of securing the evidence was available.").

*See United States v. Husband,* 226 F.3d 626, 631 (7th Cir. 2000) (record insufficient to determine reasonableness of police's use of general anesthesia to recover evidence in accused's mouth).

[20] *Schmerber v. California,* 384 U.S. 757, 758–59 (1966).

[21] *Schmerber,* 384 U.S. at 766–72.

[22] *Schmerber,* 384 U.S. at 770.

the only certain way to establish that the defendant was under the influence of alcohol. In *Schmerber*, the drawing of blood was a minor invasion of the body. The bodily invasion was undertaken at a hospital under a doctor's direct supervision. There was no time to get a warrant because the evidence of alcohol would have dissipated by the time a warrant would have issued. The suspect's interest in bodily integrity was high but the invasion was limited. The State's interest in obtaining the evidence in *Schmerber* was very high.

¶ 100. Even in these circumstances, the United States Supreme Court was very hesitant in admitting the blood evidence and carefully limited the application of *Schmerber*, stating:

> [W]e reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.[23]

¶ 101. And, indeed, a number of courts have found bodily intrusions similar to the intrusion in the instant case to be unreasonable.[24]

---

[23] *Schmerber*, 384 U.S. at 772.

[24] *See, e.g., Rochin v. California*, 342 U.S. 165, 172–174 (1952)(forcible extraction of contents of accused's stomach violates due process); *United States v. Cameron*, 538 F.2d 254, 258 (9th Cir. 1976) (administration of laxative unreasonable when record fails to establish that less intrusive means are available); *Colorado v. Thompson*, 820 P.2d 1160, 1165 (Colo. Ct. App. 1991) (same).

¶ 102. For the reasons stated, and on the basis of *Winston* and *Schmerber*, I conclude that without a warrant the evidence should have been suppressed.[25]

¶ 103. The inevitable discovery doctrine does not save the search. The police were not actively pursuing an alternative line of investigation at the time the discovery was made.[26]

¶ 104. For the reasons stated, I dissent.

---

[25] I conclude that a warrant (an ex parte proceeding) was necessary under the facts of the instant case. Some cases and commentators have suggested that under some circumstances an adversarial proceeding, with the opportunity for an accused to present evidence, may be necessary to invade the accused's body.

*See, e.g., United States v. Crowder,* in which Judge McGowan observed in his concurring opinion:

> Had [the Government] declined to invoke the authority of the judiciary in advance, relying instead upon after the fact justifications, we would have been presented with quite a different—and palpably more difficult—case. But because it proceeded as it did, appellant was, prior to the removal of the bullet and at the Government's insistence, afforded an evidentiary hearing before a United States District Judge in which he was represented by counsel, asserted his objections, and had the benefit of cross-examination of the Government's medical witness. Opportunity was further provided appellant, before the operation, to seek appellate scrutiny of the District Court's findings and authorizations.

543 F.2d 312, 318 (D.C. Cir. 1976) (McGowan, J., concurring). *See also State v. Overstreet,* 551 S.W.2d 621, 627–28 (Mo. 1977) (warrant for removal of bullet not valid when there was no adversarial hearing, no opportunity to cross-examine, no finding by a court of degree of medical intrusion, and no opportunity for pre-surgery appellate review).

For a discussion of cases before and after *Winston* and *Schmerber,* see 2 LaFave, *supra* note 1, § 4.1(e), at 455–71.

[26] I agree with the court of appeals' analysis of inevitable discovery in the instant case. The court of appeals stated:

¶ 105. I am authorized to state that Justice LOUIS B. BUTLER, JR. joins this dissent.

We conclude that inevitable discovery is not applicable here because of the invasion of the body. If we were to rule as the State suggests, there would be no incentive for the police to respect the bodily integrity of persons in custody because they could always argue inevitable discovery.

*State v. Payano-Roman,* 2005 WI App 118, ¶ 16 n.3, 284 Wis. 2d 350, 701 N.W.2d 72.