# COURT OF APPEALS
## DECISION
## DATED AND FILED

## December 22, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No. 2019AP1539-CR** | Cir. Ct. No. 2015CF4822 |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS**<br>**DISTRICT I** |

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

FREDERICK JENNINGS,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JANET C. PROTASIEWICZ and LINDSEY CANONIE GRADY, Judges. *Reversed and cause remanded*.

Before Brash, P.J., Graham and White, JJ.

¶1 GRAHAM, J. Police detained Frederick Jennings for an investigatory stop and eventually found heroin in the pocket of his pants. Jennings moved to suppress the evidence on the grounds that the police did not have

reasonable suspicion to detain him. The circuit court denied Jennings' motion and his subsequent motions for reconsideration and for postconviction relief.[1] We conclude that the State did not meet its burden to prove that the officers had reasonable suspicion to detain Jennings, and therefore, that the court erred by denying his suppression motion. Accordingly, we reverse the judgment and remand for further proceedings.[2]

## BACKGROUND

¶2    Three Milwaukee police officers were in a squad car on patrol when they noticed a black Toyota with darkly tinted windows that was parked on a residential street. The officers' investigation of this Toyota led them to encounter the defendant, Jennings, and ultimately to arrest him for possessing a controlled substance.

¶3    Officers Newport and Schwarzhuber later testified to starkly different accounts of their initial encounter with Jennings, and we will discuss their testimony in greater detail below. However, the officers agreed that they observed Jennings close the Toyota's front passenger side door and walk toward a residence. The officers then detained Jennings for an investigatory stop—a type of warrantless seizure in which officers "detain a person in a public place for a reasonable period of time," and that must be based on reasonable suspicion of

---

[1] The Honorable Timothy M. Witkowiak presided over Jennings' motion to suppress evidence and his motion to reconsider that decision. The Honorable Janet C. Protasiewicz entered the judgment of conviction. The Honorable Lindsey C. Grady entered the order denying postconviction relief.

[2] Although the appellant also appeals an order denying his postconviction motion, we do not separately address it because our decision about the judgment is dispositive.

criminal activity. ***State v. Patton***, 2006 WI App 235, ¶9, 297 Wis. 2d 415, 724 N.W.2d 347.

¶4    After detaining Jennings, Officer Newport turned his attention to the Toyota. Based on his observations of the vehicle, which are detailed below, Newport opened the Toyota's passenger side door and searched the vehicle, discovering a bag of marijuana and other contraband. The officers then arrested Jennings, and during a search incident to his arrest, they discovered a plastic bag containing heroin in his pocket.

¶5    Jennings was charged with one count of possession of heroin with intent to deliver. It is undisputed that Jennings was not the owner of the Toyota, and the State did not charge him with any crimes related to the contraband found in the vehicle.

¶6    Jennings moved to suppress the evidence. He argued, among other things, that the investigatory stop was unlawful because the officers did not have reasonable suspicion to detain him. During the hearing that followed, the State called Officers Newport and Schwarzhuber to testify, and Jennings played footage from Schwarzhuber's body camera. We now recount this evidence in detail because Jennings argues that the two officers' accounts cannot be reconciled; that Newport's account was not credible; and that the officers did not have reasonable suspicion for the investigatory stop based on Schwarzhuber's account.

*Officer Newport's Testimony*

¶7    Officer Newport testified to the following facts regarding Jennings' arrest. Newport was riding in the front passenger seat of the squad car, Officer Schwarzhuber was seated directly behind him in the back seat, and a third officer,

Ferguson, was driving. At approximately 5:00 p.m., the squad car was headed west on Chambers Street, and the officers noticed the Toyota with its darkly tinted windows parked on the north side of the street. Newport testified that in his experience, drug dealers use darkly tinted windows "to conceal their identity from law enforcement." He also testified that every single time he has stopped a car with excessively tinted windows in that district of Milwaukee on a prior occasion, he has found evidence of other illegal conduct.

¶8 On the evening in question, Officer Ferguson pulled the squad car up "just in front of the vehicle" and activated a spot lamp, illuminating the Toyota's untinted windshield. From his vantage point in the passenger seat of the squad car, Officer Newport turned his head and saw an individual later identified as Jennings through the Toyota's windshield. Newport emphasized that Jennings was sitting in the front passenger seat, and that the Toyota's passenger side door was closed. According to Newport, Jennings "looked up at [the officers] very wide-eyed," "made a furtive movement toward the floor board," and then opened the passenger side door and "quickly exited" the vehicle. Jennings proceeded to walk "quickly" toward the residence in front of which the vehicle was parked.

¶9 Officer Newport exited the squad car and ordered Jennings to stop. Jennings stopped and responded "what, what, what," and Newport gestured for Jennings to come to him. Jennings did not immediately do so, and Newport overtook Jennings and took "control of his wrist." The parties appear to agree that this was the moment that Jennings was "seized" for Fourth Amendment purposes.

¶10 Officer Schwarzhuber then "took control" of Jennings, and Officer Newport turned his attention to the Toyota. Newport testified that he smelled the odor of marijuana coming from the vehicle, and that when he looked in through

the windshield, he was able to see a marijuana stem that was later determined to weigh .01 grams in the cup holder of the vehicle's center console. As explained above, Newport's subsequent search of the Toyota eventually led to Jennings' arrest.

*Officer Schwarzhuber's Testimony*

¶11 Officer Schwarzhuber testified to the following facts. On the evening in question, the squad car was turning west onto Chambers Street when Schwarzhuber noticed a black Toyota with darkly tinted windows parked on the north side of the street. At that same time, he "observed a black male" later identified as Jennings "standing with the front passenger door open, kind of in the A-frame there …." Then, "as [the squad car] turned the corner [Jennings] quickly shut the door and started to walk towards a house." Approximately "three to five seconds" later, when the squad car pulled to a stop in front of the Toyota, Jennings was "on the walkway to the house."

¶12 Officer Schwarzhuber exited the squad car and told Jennings to stop. Jennings did not immediately respond, but he did stop after Schwarzhuber repeated his command. Schwarzhuber remained with Jennings and "conducted a field interview" while Officer Newport investigated the Toyota. Schwarzhuber then assisted in placing Jennings under arrest after Newport found marijuana in the Toyota. Jennings had a towel in his hand, and at some unspecified point, he told Schwarzhuber that he had been "wiping the car down."

*Video From Officer Schwarzhuber's Body Camera*

¶13 Officer Schwarzhuber's body camera video was also admitted at the hearing. The video begins shortly before the squad car turns left onto Chambers

Street. Soon after the turn, the Toyota comes into view parked on the right side of the street. The camera angle provides a limited view as the squad car approaches, and the video does not show whether any person is sitting in the Toyota, standing next to it, or walking away. At fifteen seconds, indicated on the video as 00:15, the taillights of the Toyota can be seen to flash. At 00:18, the squad car slows, with Officers Newport and Schwarzhuber both looking to their right. At 00:21, the squad car turns sharply to the right and appears to park the Toyota in, coming to a full stop at 00:23. The video does not show the Toyota or whether there is a person inside or outside it at that time. Newport immediately exits the squad car, and Schwarzhuber exits at 00:25. Jennings can first be seen on the walkway facing in Newport's direction at 00:28, and at 00:30, the video shows Newport grabbing Jennings by the wrist.

¶14 In his argument before the circuit court, Jennings pointed out the conflict between the two officers' versions of the arrest—specifically regarding Jennings' location at the time the squad car pulled to a stop in front of the Toyota. Jennings' trial counsel conceded that if Officer Newport's version of events were to be believed, there was reasonable suspicion for an investigatory stop in light of the furtive movement Newport described. However, Jennings argued that Newport's account was not credible and that Newport did not see Jennings inside the vehicle making any movement, furtive or otherwise. Jennings argued that Officer Schwarzhuber's account was the only account that could be believed, and that based on that account, the officers lacked reasonable suspicion to detain him.

¶15 The circuit court expressly declined to determine which account, Officer Newport's or Officer Schwarzhuber's, was more credible. The court did appear to question Newport's claim that he was able to identify a marijuana stem weighing .01 grams from outside the vehicle, but stated that it was "possible."

6

The court declined to make any specific finding about Jennings' location when the officers first encountered him. Instead, the court credited both officers' accounts, stating that the difference between the accounts was not "substantial." It suggested that the difference in the testimony about Jennings' location could be explained by the fact that the officers were seated in "two different areas of the police vehicle." Ultimately, the court determined that the officers could legally detain Jennings due to his association with the Toyota because overly tinted windows violate a Milwaukee ordinance.[3]

¶16 Jennings moved for reconsideration, and his motion was denied. He pled guilty and was convicted. He then filed a postconviction motion arguing that his trial counsel was ineffective for conceding that there was reasonable suspicion to support the stop under Officer Newport's version of the events. The circuit court denied this motion, and Jennings appeals.

## DISCUSSION

¶17 On appeal, Jennings argues that the circuit court erred by denying his suppression motion and his postconviction motion. We do not address Jennings' arguments about his postconviction motion because our determination that the court erred in the first instance by denying Jennings' suppression motion is dispositive. *See **Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352

---

[3] The parties dispute whether the circuit court also considered the smell of marijuana as a fact contributing to reasonable suspicion for the stop. If the court had done so, this would have been clear error; Officer Newport testified that he smelled marijuana *after* he detained Jennings. But we see nothing in Judge Witkowiak's oral ruling to suggest that he considered the smell of marijuana in his analysis of whether the initial detention of Jennings was lawful. Rather, this suggestion comes from the order denying Jennings' *postconviction* motion—in that order, a second judge inaccurately stated that Judge Witkowiak had relied on "the odor of fresh marijuana emanating from the vehicle" when he denied Jennings' motion.

Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

¶18    The review of an order granting or denying a suppression motion presents a question of constitutional fact. *State v. Johnson*, 2013 WI App 140, ¶6, 352 Wis. 2d 98, 841 N.W.2d 302. We uphold the circuit court's findings of fact unless they are clearly erroneous, and we review the application of constitutional principles to those facts de novo. *Id.*

¶19    The Fourth Amendment prohibits unreasonable searches and seizures by the government, U.S. CONST. amend. IV, and an investigatory stop is a "seizure" for Fourth Amendment purposes, *see Graham v. Connor*, 490 U.S. 386, 388 (1989). Warrantless searches and seizures are presumptively unreasonable, and the State bears the burden of proving that a warrantless intrusion falls under one of the exceptions to the Fourth Amendment's warrant requirement. *State v. Payano-Roman*, 2006 WI 47, ¶30, 290 Wis. 2d 380, 714 N.W.2d 548. Specifically, the State must show by a "preponderance of the evidence" that a warrant exception applies. *Nix v. Williams*, 467 U.S. 431, 444 (1984).

¶20    To conduct a lawful warrantless investigatory stop, an officer must have reasonable suspicion that "some kind of criminal activity has taken or is taking place." *State v. Richardson*, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990). Although reasonable suspicion is a lower standard than probable cause, it still "must be based on more than an officer's 'inchoate and unparticularized suspicion or hunch.'" *State v. Post*, 2007 WI 60, ¶10, 301 Wis. 2d 1, 733 N.W.2d 634 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). "[T]he officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the intrusion of the stop." *Id.*

(quoting ***Terry***, 392 U.S. at 21). Whether there is reasonable suspicion for an investigatory stop is based on the totality of the facts known to the officer at the time of the stop. *See* ***State v. Waldner***, 206 Wis. 2d 51, 58, 556 N.W.2d 681 (1996). This test is objective and focuses on what a reasonable officer would suspect "in light of his or her training and experience." ***Id.*** at 56.

## I. Analysis of the Totality of the Circumstances

¶21    The State argues that the totality of the circumstances establishes reasonable suspicion. Specifically, it points to the window tint on the Toyota, the testimony that Jennings made a "furtive movement" and "quickly exited" the Toyota, and Jennings' actions after the officers commanded him to stop. Jennings argues that the credible evidence does not establish reasonable suspicion, and that "this is truly a case where zero plus zero plus zero really does equal zero."

¶22    We begin by addressing the argument that Jennings could be detained for an ordinance violation based on his proximity to and association with a parked vehicle with darkly tinted windows, which appears to have been the basis for the circuit court's decision. After rejecting this basis for the stop, we turn to address the facts that, according to the State, establish reasonable suspicion—namely, the testimony that darkly tinted windows are associated with criminal activity, the officers' observations of Jennings at the time they first encountered him, and their testimony about Jennings' actions after the officers exited the vehicle and commanded him to stop. For the reasons we discuss, we ultimately conclude that the officers detained Jennings without reasonable suspicion, and in so doing, they violated the Fourth Amendment.

## A. The Window Tint

¶23    The reason that Jennings first came to the officers' attention was the dark tint on the Toyota's windows.  In its oral ruling, the circuit court appeared to conclude that Jennings' presence in or near the passenger side of the vehicle sufficed to show an ordinance violation, and that the officers were "entitled to stop [Jennings] as part of the ordinance violation."

¶24    Under a Milwaukee city ordinance, it is illegal for a person to operate a vehicle that does not conform to Wisconsin administrative code requirements,[4] and it is undisputed that the tint on the Toyota's windows was too dark for a person to legally operate it on Wisconsin highways.  The State argues that "the *vehicle's* ordinance violation was one factor giving rise to reasonable suspicion to detain [Jennings]."  (Emphasis added.)  But the State fails to appreciate that a "vehicle" cannot violate the ordinance in question—instead, the ordinance applies to a "person" who "operate[s]" a vehicle with nonconforming equipment "on Wisconsin highways."  WIS. ADMIN. CODE § TRANS. 305.32.

¶25    The State does not attempt to argue that Jennings' presence in or near the passenger side of the parked Toyota constitutes "operating" the vehicle. During the circuit court proceedings, the State repeatedly asserted that Jennings "controlled" the Toyota.  However, on appeal, it does not argue that Jennings

---

[4] MILWAUKEE CODE OF ORDINANCES § 101-4.5(1) adopts WIS. ADMIN. CODE Ch. TRANS 305 (through November 2020), which is entitled "Standards for Vehicle Equipment." WISCONSIN ADMIN. CODE § TRANS 305.32(4)(b) specifies the permissible window tint level for a vehicle.  WISCONSIN ADMIN. CODE § TRANS 305.03 provides that "[n]o person may operate or allow to be operated on Wisconsin highways" any vehicle that does not conform to the chapter's requirements, which include the window tint requirement.

All references to the Wisconsin Administrative Code are to the November 2020 Register.

violated any ordinance by doing so. Indeed, the State tacitly concedes that Jennings could not have been cited for violating any ordinance relating to the tint of the windows, going so far as to call Jennings' argument on that issue a "red herring." In other words, despite the circuit court's stated rationale for denying Jennings' motion, the State does not advance the argument that any "ordinance violation" was sufficient to justify the stop. We conclude that it was not.

¶26 The State's primary argument regarding the window tint appears to be that Jennings' association with the Toyota, and the testimony linking darkly tinted windows to other criminal activity, contributed to reasonable suspicion. The State points to Officer Newport's testimony that, in his experience, improperly tinted windows are associated with other criminal activity, particularly drug-dealing.

¶27 We have considered a vehicle's darkly tinted windows to be a fact that, under some circumstances and along with other articulated facts, can contribute to reasonable suspicion to extend a lawful stop. *See State v. Floyd*, 2016 WI App 64, ¶16, 371 Wis. 2d 404, 885 N.W.2d 156, *aff'd on other grounds*, 2017 WI 78, 377 Wis. 2d 394, 898 N.W.2d 560. However, we have never held that tinted windows alone can justify the detention of a person who is not operating the vehicle in question.[5] Such a rule would paint with far too broad a brush, and would "be so general" as to "risk sweeping into valid law-enforcement concerns persons on whom the requisite individualized suspicion has not [been]

---

[5] The State does not appear to argue that the tinted windows, alone, amounted to reasonable suspicion in this case; it instead argues that the window tint "contributed to the officers' reasonable suspicion," along with other facts.

focused." ***State v. Gordon***, 2014 WI App 44, ¶12, 353 Wis. 2d 468, 846 N.W.2d 483.

¶28 In summary, we reject the circuit court's stated rationale for denying Jennings' suppression motion. We further conclude that to the extent that Jennings' association with the Toyota could contribute to a reasonable suspicion determination, it cannot do so alone and must be bolstered by other facts. Accordingly, we must consider the other facts that the State relies on to meet its burden of proof.

## B. Testimony About Jennings' Actions Inside the Toyota

¶29 We now turn to the officers' testimony about Jennings' actions when they first encountered him, including Officer Newport's testimony about his observations of Jennings inside the Toyota. As discussed above, according to Newport, Jennings was seated in the front passenger seat of the Toyota at the moment the squad car stopped. Newport testified that he observed Jennings "look[] up at [the officers] very wide-eyed," make a "furtive movement towards the floor board," and then "quickly exit[] the front passenger door of the vehicle."

¶30 The United States Supreme Court has explained that "nervous, evasive behavior" can contribute to reasonable suspicion. ***Illinois v. Wardlow***, 528 U.S. 119, 124 (2000). According to the State, Officer Newport's observations show that Jennings attempted to "evade" the police. For his part, Jennings appears to acknowledge that Newport's testimony, if believed, would at least contribute to a determination that there was reasonable suspicion to detain him.[6] Yet Jennings

---

[6] As noted, Jennings' trial counsel conceded that there was reasonable suspicion for the stop based on Newport's account. Now on appeal, Jennings argues that neither officer's account

(continued)

argues that Newport's testimony should not be believed because, among other things, it directly conflicts with Officer Schwarzhuber's testimony, and that the two officers' accounts cannot be reconciled.

¶31     As an initial matter, we agree that the officers' accounts of their initial encounter with Jennings cannot be reconciled.   For Officer Newport's testimony to be believed, Jennings had to have been *inside* the Toyota at the moment that the squad car pulled to a stop.   But according to Officer Schwarzhuber, Jennings was already standing *outside* the Toyota as the squad car first turned onto Chambers Street; Jennings never re-entered the Toyota; and by the time the squad car pulled to a stop, Jennings was on the walkway to the house. Accordingly, based on Schwarzhuber's account, it would have been impossible for Newport to observe Jennings make a furtive movement and quickly exit the Toyota in response to the police presence.

¶32     We further conclude that the differences between the officers' accounts are material because the State relies on Jennings' actions inside the Toyota, in part, to establish reasonable suspicion for the stop.   Additionally, the circuit court's explanation for the difference between the officers' testimony does not hold up to scrutiny and is clearly erroneous.   The court stated that it did not "see a major problem with the credibility of the officers' testimony," and that any discrepancy could be explained by the fact that the officers would have had different vantage points from their different seats in the squad car.   Yet Officer

gives rise to reasonable suspicion. *See, e.g.*, **State v. Johnson**, 2007 WI 32, ¶43, 299 Wis. 2d 675, 729 N.W.2d 182 (concluding that the defendant's furtive movement, "[w]ithout more," did not establish reasonable suspicion).   However, Jennings does not argue that "furtive movements" and evasive behavior cannot generally be considered as part of the totality of the circumstances supporting reasonable suspicion.

Schwarzhuber did not testify that he was unable to see Jennings—to the contrary, he specifically testified that he was able to see Jennings already outside the car and then on the walkway to the house "three to five seconds" before Officer Newport supposedly observed Jennings in the front passenger seat.

¶33    Notably, despite specific urging from Jennings, the circuit court did not determine that one account was more credible than the other, nor did it make any findings about whether Officer Newport actually saw Jennings make a furtive movement and quickly exit the vehicle.[7]  The court appeared to conclude that it was not necessary to make any such findings because the stop was justified by the "ordinance violation"—an argument that we have rejected.

¶34    "When a [circuit] court makes findings of fact as to the credibility of witnesses, we will not upset those findings unless they are clearly erroneous." *Lessor v. Wangelin*, 221 Wis. 2d 659, 665-66, 586 N.W.2d 1 (Ct. App. 1998). Here, the circuit court credited both officers' accounts, and standing alone, we would not see any reason in the record to conclude that either account was incredible.  However, the officers' accounts do not stand alone, and when taken together, they cannot both be accurate.

---

[7] We recognize that in its oral ruling, the court explained that the officers were "entitled to stop [Jennings] as part of the [window tint] ordinance violation" because he was in the Toyota "initially." The State asserts that this is tantamount to a specific finding that Officer Newport saw Jennings in the passenger seat of the vehicle, but this assertion is not persuasive. The court did not explain what it meant by "initially," and in context, the court may have meant only that Jennings must have been inside the Toyota at some point before leaving it—Newport testified to seeing Jennings inside the vehicle, and Officer Schwarzhuber testified to seeing Jennings standing in the A-frame of the open passenger-side door. In any event, as we explain above, any finding that credits Newport's observations of Jennings in the vehicle cannot be reconciled with the court's determination that Schwarzhuber's account was also credible.

14

¶35 Under the circumstances, it could be tempting to conclude that Officer Schwarzhuber has provided the only credible account of the officers' initial encounter with Jennings. After all, the circuit court expressed doubt about other aspects of Officer Newport's testimony,[8] and to the extent that the footage from Schwarzhuber's body camera provides material evidence, it tends to more closely align with Schwarzhuber's account than Newport's. However, we need not invade the fact finder's province and make any determination about Officer Newport's credibility; under these unusual circumstances and for reasons we now explain, Newport's account of Jennings' actions inside the Toyota does not help the State meet its burden of proof.

¶36 Here, the State has offered two seemingly credible but contradictory versions of the events, and it attempts to rely on one of these versions to meet its burden to prove reasonable suspicion for the investigatory stop. But the State must prove that there was reasonable suspicion by a "preponderance of the evidence," and the testimony about Jennings' actions inside the vehicle is contradicted by equally credible evidence that negates it. If we were to rely on Officer Newport's account, which the State urges us to do, then we would be disregarding an account that the circuit court also found to be credible and that demonstrates that Newport cannot have seen what he says that he saw. Accordingly, taken together, these two accounts, both of which the circuit court found to be credible, do not provide proof of anything by a preponderance of evidence. We conclude that under these unusual circumstances, the State cannot

---

[8] The circuit court commented that Officer Newport's claim that from his vantage point outside the car he could see a marijuana stem weighing .01 grams in the cup holder of the Toyota "raises some concerns, but it is possible."

rely on Officer Newport's testimony about Jennings' actions inside the vehicle to meet its burden to show that there was reasonable suspicion for the stop.

¶37    For these reasons, we do not consider Officer Newport's testimony that Jennings made a furtive movement and quickly exited the Toyota in our analysis of the totality of the circumstances.  And once this testimony is discounted, all the State is left with to show "suspicious, evasive behavior" is Officer Schwarzhuber's testimony that Jennings "quickly" closed the passenger door, and Newport's testimony that Jennings "quickly" walked toward the house.[9] This testimony does not contribute to reasonable suspicion sufficient to justify a stop.  There is nothing unusual about a person closing a car door upon leaving a vehicle, nor is it unusual to do so "quickly," nor is it unusual to walk "quickly" towards an intended location after exiting a vehicle.

¶38    Although the State argues that these actions show that Jennings attempted to "evade" the police, once Officer Newport's contradicted testimony is discounted, there is nothing left to show that Jennings even *noticed* the police before beginning to walk away from the Toyota.  In fact, Officer Schwarzhuber testified that Jennings was standing in the "A-frame" of the passenger side door when the squad car turned onto Chambers Street, suggesting that Jennings was potentially in the process of exiting the Toyota before he could have seen the

---

[9] In its brief, the State appears to incorrectly attribute some of Officer Newport's testimony to Officer Schwarzhuber.  The State asserts that "both officers testified that Jennings 'quickly' exited from the Toyota … and then 'quickly' walked towards the house as the officers approached."  This does not accurately reflect the officers' testimony.  Schwarzhuber testified only that he observed Jennings "quickly" close the door of the vehicle.  It was Newport who testified that Jennings "quickly" exited the Toyota and "quickly" walked toward the house, and for the reasons we have explained, we are not considering Newport's testimony about the manner in which Jennings exited the vehicle.

squad car. Discounting Newport's contradicted testimony, there is nothing left in the officers' account to show any evasive or otherwise suspicious behavior.

### C. Testimony About Jennings' Actions Outside the Vehicle

¶39 Finally, the State points to the officers' testimony about Jennings' actions after the officers exited the squad car and ordered him to stop. As discussed above, the parties appear to agree that Jennings was seized at the moment when Officer Newport grabbed his wrist; we assume without deciding that this is correct, and that the facts immediately leading to that moment can properly be considered in the totality of the circumstances.

¶40 First, the State argues that it was "suspicious" that Jennings did not immediately stop when ordered to do so by the officers. There are several problems with this argument. To begin, the officers' testimony on this point is ambiguous. Officer Newport testified that Jennings stopped when he ordered him to do so; Officer Schwarzhuber testified that Jennings did not respond to his first command to stop but did respond to his second.[10] In any event, the body camera video shows Newport holding Jennings' wrist within approximately five seconds of the officers exiting the squad car, meaning that if Jennings did not immediately comply with the officers' commands, it was mere seconds before he did comply.

¶41 But even if Jennings did not immediately comply, "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about [their] business."

---

[10] Officer Schwarzhuber's body camera video does not shed light on this discrepancy because the audio of this portion of the encounter is muted.

17

*Wardlow*, 528 U.S. at 125; *see also* **State v. Young**, 2006 WI 98, ¶73, 294 Wis. 2d 1, 717 N.W.2d 729 (individuals have "the right to disregard the police and walk away without giving rise to reasonable suspicion"). We have determined that the officers did not have reasonable suspicion to detain Jennings at the time they exited the squad car and ordered him to stop. To be sure, if an individual responds to police presence with "unprovoked flight," that fact may contribute to reasonable suspicion—this is because "flight, by its very nature, is not 'going about one's business[.]'" *Wardlow*, 528 U.S. at 125. But merely failing to respond to a command to stop is far from "unprovoked flight"; rather, it falls squarely into the category of "disregard[ing] the police and walk[ing] away[.]" *Young*, 294 Wis. 2d 1, ¶73.

¶42    Second, the State argues that it was "suspicious" that Jennings questioned the command to stop, saying "what, what, what." The State cites no authority for the proposition that it is "suspicious" for a person to ask what they are being stopped for when they are being told to stop by police. On the contrary, this may well be the most obvious question to ask when being stopped by the police. In any event, if an individual may disregard the police and walk away without arousing suspicion, it follows that an individual may also take a more forthright approach and ask the officer for an explanation for the stop without arousing suspicion.

¶43    Before turning to the State's final argument, we pause to reflect on the troubling nature of the State's arguments that it was "suspicious" for Jennings to walk away from police and to ask them why they were stopping him. Not only are these arguments contrary to *Wardlow*, but they are also at odds with the plain text of the Fourth Amendment, which guarantees individuals the right to be free from "unreasonable searches and seizures" by the government. U.S. CONST.

amend. IV. If disregarding or questioning an attempted unlawful seizure can make that seizure lawful, then individuals are *not*, in fact, free from unreasonable seizures at all.

¶44 Finally, the State argues that Jennings' "bizarre response that he was 'wiping the vehicle ... down'" was "suspicious." There are at least two problems with this argument. First, the officers did not testify that Jennings made this statement before the seizure had occurred, and the body camera video shows Jennings making this statement *after* he had already been seized. Thus, it could not have contributed to reasonable suspicion for the seizure. Second, the State fails to explain what could be "bizarre" about this statement, particularly because the body camera video shows that Jennings was holding a moist towelette at the time of the seizure.

¶45 In sum, the only fact that arguably contributes to reasonable suspicion for the stop is the fact that officers observed Jennings either seated in or standing next to the passenger seat of a vehicle with darkly tinted windows. But as we have concluded, this by itself cannot amount to reasonable suspicion. As for the rest of the facts that the State points to, we agree with Jennings that they amount to adding together zeroes. Based on the totality of the circumstances, there were not "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the intrusion of the stop." ***Post***, 301 Wis. 2d 1, ¶10 (quoting ***Terry***, 392 U.S. at 21). Accordingly, we conclude

that the State has not met its burden to prove that the officers had reasonable suspicion to support the investigatory stop.[11]

## II. Remedy

¶46    The State does not dispute that the evidence Jennings seeks to suppress was derived from the investigatory stop.  If a search or seizure violates a defendant's Fourth Amendment rights, the remedy is generally suppression of the evidence derived from that intrusion.  *See State v. Keith*, 2003 WI App 47, ¶8, 260 Wis. 2d 592, 659 N.W.2d 403; *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  Exclusion of illegally obtained evidence may be inappropriate under certain Fourth Amendment doctrines, *see, e.g.*, *State v. Jackson*, 2016 WI 56, ¶70, 369 Wis. 2d 673, 882 N.W.2d 422, but the State makes no argument that any such doctrines apply here.  Accordingly, we conclude that the evidence should have been suppressed, and that the circuit court erred by denying Jennings' suppression motion.

## CONCLUSION

¶47    For all these reasons, we conclude that the investigatory stop of Jennings was not supported by reasonable suspicion.  Therefore, we reverse the circuit court's denial of the suppression motion, reverse the judgment of conviction, and remand for further proceedings consistent with this opinion.

---

[11] Much of the State's brief appears to address whether the search of the Toyota and the subsequent arrest of Jennings were lawful.  But Jennings' challenge is limited to the initial investigatory stop, and so the State's arguments about the subsequent vehicle search and arrest are not germane to this appeal.

*By the Court.*—Judgment reversed and cause remanded.

Not recommended for publication in the official reports.